RAMÍREZ, SEGAL & LÁTIMER, demandantes y recurrentes, *v.* AGUSTÍN ROJO RIGUAL y OTROS, demandados y recurridos.

*Número:* R-83-434      *Resuelto:* 20 de enero de 1989

*Benjamín Rodríguez Ramón*, de *Rodríguez-Ramón, Peña & Cancio*, abogado de los recurrentes; *Freddie Pérez González*, de *Woods, Rosenbaum, Luckeroth & Pérez González*, abogado del recurrido Agustín Rojo García, y *Etienne Totti Del Valle*, de *Domínguez & Totti*, abogado de los recurridos Agustín Rojo Rigual, Zenaida García y la Sociedad de Gananciales compuesta por éstos, Delio Rojo García, Roberto Spin, Luisa Rojo de Spin y la Sociedad de Gananciales compuesta por éstos.

LA JUEZ ASOCIADA SEÑORA NAVEIRA DE RODÓN emitió la opinión del Tribunal.

El presente caso nos permite analizar la aplicación de las disposiciones del Código Civil y de los cánones de ética profesional a un contrato mixto de honorarios de abogado por servicios profesionales, donde se estipula que cierta cantidad se computará por hora y otra se determinará a base de un por ciento del resultado, dependiendo de una contingencia.

El caso versa sobre una acción en reclamo de honorarios por servicios profesionales presentada por la sociedad de abogados Ramírez, Segal & Látimer contra Agustín Rojo Rigual, Zenaida García, la Sociedad Legal de Gananciales com-

puesta por ambos, Agustín Rojo García, Delio Rojo García, Roberto Spin, Luisa Rojo de Spin y la Sociedad de Gananciales compuesta por ambos (en adelante los señores Rojo). Luego de presentadas una moción de sentencia sumaria por los demandados, una de sentencia sumaria parcial por los demandantes, oposiciones y réplicas, y amplia prueba documental, el tribunal de instancia dictó sentencia en la que desestimó la demanda. Concluyó que no se había dado "ninguna de las contingencias consideradas por las partes en el acuerdo de servicios profesionales, a saber, no se redujo el principal reclamado ni obtuvieron los demandados indemnización alguna". *Exhibit* A, pág. 7. Estimó, además, que la reclamación de los honorarios contingentes era improcedente, ya que no cumplía el contrato con los principios enunciados en *In re Díaz Lamoutte*, 106 D.P.R. 450 (1977), y en *Colón v. All Amer. Life & Cas. Co.*, 110 D.P.R. 772, 774 (1981), y que dichos acuerdos deben aparecer "'libre de ambig[ü]edades y con óptima claridad en sus términos[,] consignando las contingencias previsibles que pudieran surgir durante el transcurso del pleito'". *Exhibit* A, pág. 7.

No conformes los demandantes, presentaron un recurso de revisión. En éste plantean, en síntesis, que el tribunal de instancia erró al interpretar el acuerdo sobre honorarios contingentes y al aplicar las normas establecidas por este Tribunal en relación con pactos de este tipo. Acordamos revisar.

## I

*Los hechos*

Luego de analizar las diferentes mociones presentadas por las partes y los documentos que las acompañan, con-

cluimos que los siguientes hechos no están en controversia.(1)

Los recurridos son los dueños de un grupo de corporaciones familiares conocidas como "Empresas Rojo", dedicadas mayormente a desarrollar proyectos de construcción. Una de las corporaciones, Residencial Colinas de Carolina, Inc. (Corporación), obtuvo una línea de crédito de la Housing Investment Corporation (Housing) por $3,300,000 para financiar un proyecto de residencias denominado "Los Caciques". Esta línea de crédito estaba garantizada por la parcela de terreno donde se desarrollaría la urbanización, único activo de la Corporación, y por los miembros de las Empresas Rojo en su carácter personal. Antes de que Housing detuviera el financiamiento del proyecto, la Corporación tomó a préstamo, en varias partidas, sumas ascendentes a un total de $1,671,500 de la cantidad de dinero aprobada. Para el 2 de julio de 1979 el préstamo había devengado intereses ascendentes a $775,775 y continuaba devengando intereses a razón de $583.38 diarios. La Corporación no pudo pagar el préstamo concedido. Los miembros de las Empresas Rojo, representados por dos (2) de ellos, Delio Rojo y Agustín Rojo, trataron de llegar a algún acuerdo de pago con el Chase Manhattan Bank (Chase), nuevo acreedor del préstamo. Las negociaciones no tuvieron éxito.

Ante la inminencia de una demanda en cobro de dinero, de una ejecución de hipoteca en contra de la Corporación y de una acción en contra de los señores Rojo en su carácter personal como garantizadores, éstos acudieron al licenciado Carlos G. Látimer, de Ramírez, Segal & Látimer, aproxima-

---

(1) Habiéndose decidido este caso a base de prueba documental solamente, por tratarse de una sentencia sumaria, estamos en la misma posición que el tribunal de instancia en relación con la determinación de los hechos. *Pueblo v. Pagán Díaz*, 111 D.P.R. 608 (1981); *Asoc. Auténtica Empl. v. Municipio de Bayamón*, 111 D.P.R. 527 (1981); *P.P.D. v. Admor. Gen. de Elecciones*, 111 D.P.R. 199 (1981); *Vega Torres v. Sucn. Mercado Riera*, 107 D.P.R. 425 (1978).

damente el 13 de junio de 1979, para que éste los asesorara y representara profesionalmente. Contrataron al licenciado Látimer y acordaron que los honorarios serían a razón de $75 la hora. Dejaron pendiente, a petición de los señores Rojo, la alternativa de pactar más adelante, a base de honorarios contingentes, de acuerdo con las circunstancias y desarrollo posterior del caso.(2) Este primer acuerdo no se consignó por escrito.

Ya establecida la relación entre abogado y cliente, los señores Rojo decidieron que Delio y Agustín Rojo continuarían las negociaciones extrajudiciales con el Chase, pero dirigidos por el licenciado Látimer. Todos consideraban que ellos dos (2) tenían la suficiente y necesaria experiencia para negociar directamente con los oficiales de dicha institución bancaria. Tales negociaciones extrajudiciales no tuvieron resultados positivos. El 3 de julio de 1979, el Chase demandó en cobro de dinero y ejecución de hipoteca tanto a la Corporación como a los integrantes de las Empresas Rojo en su carácter personal como garantizadores.

El licenciado Látimer y los señores Rojo discutieron el asunto y concluyeron que existían buenas probabilidades de transigir este pleito. Incluso discutieron varios arreglos o transacciones posibles, entre las cuales se encontraba la entrega de la finca que sirvió de garantía hipotecaria al préstamo, a cambio de que el Chase desistiera del cobro de la deuda. Esta alternativa era la que los señores Rojo consideraban la mejor.

Así las cosas, el licenciado Látimer contestó la demanda y presentó una reconvención por la suma de $6,500,000. También presentó una demanda contra Housing y Chase, en la

---

(2) Contrataron al licenciado Látimer para que los representara como garantizadores de ésta y otras diez (10) corporaciones en las cuales ellos eran los accionistas principales. Réplica a Solicitud de Sentencia Sumaria Parcial presentada por el codemandado Agustín Rojo Rigual, págs. 3 y 4, *Exhibit* S.

que reclamaba daños y perjuicios por incumplimiento del contrato de financiamiento, y por otros actos torticeros, por una suma indeterminada que excedía de $1,600,000. A juicio de la firma de abogados, esta demanda tenía un fundamento sólido. Su propósito al presentarla era crear una posición negociadora fuerte con miras a lograr una transacción razonable para sus clientes, los señores Rojo.

Posteriormente, los señores Rojo y el licenciado Látimer llegaron a un nuevo acuerdo sobre honorarios de abogado. Éste incluía tanto el pago de honorarios computados por hora como el pago de honorarios fundamentados en una contingencia. Dicho acuerdo se formalizó dieciséis (16) meses después de haberse iniciado una relación profesional y personal intensa entre los abogados y los señores Rojo.

El nuevo contrato para el pago de los honorarios de abogado por servicios profesionales se recoge en la siguiente carta de 26 de octubre de 1979, firmada por el licenciado Látimer y dirigida por el bufete de Ramírez, Segal & Látimer a los señores Rojo —quienes la firmaron— en prueba de su conformidad:

> Por la presente confirmo nuestro acuerdo relativo a los honorarios de abogado por nuestros servicios profesionales en los trámites de los casos que les menciono en el epígrafe, a los siguientes efectos:
>
> Nuestra firma les facturará por los trabajos realizados a razón de $50.00 la hora. *En adición nuestra firma recibirá un 20% de aquellas sumas en que el principal reclamado por Housing Investment Corp. se reduzca y un 20% de toda inde[mn]ización que ustedes o las corporaciones controladas por ustedes, demandantes y reconvenientes, obtengan bien se[a] por sentencia o por transacción.* El 20% mencionado no se aplicará a cualesquier reducción en los intereses reclamados por Housing Investment Corporation.
>
> Ustedes nos harán un pago inicial de $10,000.00 no reembolsable, con cargo a los honorarios que se devenguen según arriba se ha indicado.

Esta firma no asume la representación legal de Eduardo Rojo Garc[í]a en la reclamación de Housing Investment contra él, por razones éticas ya que entendemos que asumimos la representación de intereses conflictivos con él en una transacción habida con su familia.

Le rogamos indiquen vuestra conformidad con lo anteriormente expresado firmando y devolviéndonos copia de esta comunicación. (Énfasis suplido.) *Exhibit* AA, págs. 1–2.

El 7 de julio de 1980, ya vigente y formalizado por escrito este nuevo contrato para el pago de los honorarios de abogado, los miembros de las Empresas Rojo, a través de Agustín Rojo, recibieron del Chase una oferta de transacción. En síntesis, ésta ofrecía recibir la finca que garantizaba el préstamo y relevar a la Corporación y a todos los garantizadores solidarios del pago del préstamo e intereses. Todo ello a cambio de que todas las otras corporaciones demandantes en el Caso Civil Núm. 79–5915, y Agustín Rojo Rigual, Agustín Rojo García, Delio Rojo García, Eduardo Rojo García y Luisa Rojo de Spin, desistieran de todas las reclamaciones judiciales y alegadas causas de acción, y de la reconvención presentada en el Caso Civil Núm. 79–4226.[3]

---

[3] La carta del Chase lee así:

"Hacemos referencia a nuestro compromiso de notificarle nuestra oferta de transacción para solucionar en definitiva los casos de epígrafe sin que la misma constituya una admisión de hechos o de responsabilidad por parte de nuestra institución bancaria o de Housing Investment Corporation.

"El Chase Manhattan Bank, NA está en disposición de aceptar de Residencial Colinas de Carolina, Inc. el predio de terreno conocido como 'Los Caciques' y asumir el pago de todas las contribuciones territoriales adeudadas; relevar a Residencial Colinas de Carolina, Inc. y a todos sus garantizadores solidarios del pago de su deuda hipotecaria sobre dicho proyecto, la cual asciende al día de hoy a $1,673,107.50 y $1,050,157.98 de intereses.

"A cambio de dichas concesiones, Residencial Colinas de Carolina, Inc. [y] todas las otras corporaciones que son demandantes en el [C]aso Civil 79–5915 y Agustín Rojo Rigual, Agustín Rojo García, Delio Rojo García, Eduardo Rojo García y Luisa Rojo [de Spi]n deberán de desistir de todas sus reclamaciones judiciales y alegadas causas de acción, con perjuicio, entabladas en los casos de epígrafe; renunciar a toda reclamación pasada, presente o futura relacionada con los financiamientos interinos u otras transacciones relacionadas con dichos financia-

El viernes 18 de julio de 1980 se reunió el licenciado Látimer con Delio y Agustín Rojo para redactar la carta de aceptación de la oferta del Chase. Aunque el licenciado Látimer aconsejó que no aceptaran esta primera oferta de transacción, pues era su opinión que podía lograrse una mucho más favorable, los señores Rojo decidieron aceptar. Fue en el momento de ir a redactar la carta de aceptación que surgió la controversia sobre el pago de los honorarios contingentes pactados entre ellos.(4) El licenciado Látimer alegó tener derecho a recibir el veinte por ciento (20%) de la diferencia entre el principal del préstamo no pagado y el valor de la finca que el Chase aceptaba para transigir ambos pleitos. El licenciado Látimer entendía que, a tenor con lo pactado para computar los honorarios contingentes adeudados al principal del préstamo no pagado, debía restársele el valor de la finca; el veinte por ciento (20%) de la diferencia serían los honorarios.

Delio y Agustín Rojo alegaron, por el contrario, que no hubo reducción del principal y que esa transacción no se consideró en la carta que suscribieron; por lo tanto, el licenciado Látimer no tenía derecho a cobrar honorarios contingentes por la labor realizada. Como no se pusieron de acuerdo, deci-

---

mientos o desarrollos residenciales y/o construcción de viviendas y disposición de hipotecas sobre dichos desarrollos residenciales que tengan o puedan tener contra The Chase Manhattan Bank, NA y Housing Investment Corporation, sus directores, oficiales, accionistas, cesionario, abogados, mandatarios y/o representantes.

"Su respuesta a lo anterior le será agradecida." *Exhibit* U.

(4) Del Alegato en réplica del recurrido Agustín Rojo García, pág. 30, se desprende que los señores Rojo consideraban demasiado alta la cantidad a pagarse como contingencia. En dicho alegato, expresaron lo siguiente: "Los recurridos nunca han cuestionado la calidad profesional desplegada por los recurrentes durante su gestión en los casos, inclusive se estipuló que estuvieron satisfechos con dicha labor. Tampoco se cuestiona la complejidad de las controversias planteadas en ambos casos. Sin embargo, ello no implica que dicha labor, por altamente profesional que haya sido, justifique en el presente caso honorarios ascendentes a $240,000."

dieron continuar la reunión el próximo día para redactar la carta de aceptación de la oferta y, además, para ponerse de acuerdo sobre los honorarios. Sin embargo, ese mismo día, en horas de la noche, Delio y Agustín Rojo acudieron a las oficinas de otros abogados, el bufete de Laffitte & Domínguez. Allí redactaron una carta de aceptación de la oferta del Chase. En esta carta se indicaba lo siguiente: "Mediante copia de esta carta al Lic. Carlos Látimer, le estamos instruyendo para que no tome acción ulterior alguna en torno a estos casos." *Exhibit* V.

Los trámites para estructurar la transacción acordada por los señores Rojo y el Chase tardaron varios meses en llevarse a cabo.

## II

*Los cánones de ética profesional y los honorarios de abogado*

Los cánones de ética profesional constituyen un cuerpo de principios éticos desarrollados para guiar la conducta profesional de la clase togada. En relación con los honorarios profesionales, el Canon 24 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, párrafo 1ro, específicamente dispone que su fijación "debe regirse siempre por el principio de que nuestra profesión es una parte integrante de la administración de la justicia y no un mero negocio con fines de lucro". Para evitar controversias con los clientes sobre la compensación por los servicios prestados, es *deseable* que el acuerdo sobre honorarios a que se llegue sea reducido a escrito con la mayor claridad posible. Los honorarios contingentes no están reñidos con la ética, especialmente cuando el cliente los prefiera y se le haya explicado de sus consecuencias. Canon 24, *supra*; *López de Victoria v. Rodríguez*, 113 D.P.R. 265, 268, 269 (1982). En relación con éstos, es preferible que se consignen en el acuerdo escrito las contingencias

previsibles que pudieran surgir durante el transcurso del pleito. Cánones 24 y 25 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX; *Colón v. All Amer. Life & Cas. Co.*, supra.

■ Al fijar los honorarios profesionales, las partes pueden tomar en consideración, entre otras cosas, la cuantía involucrada en el litigio; los beneficios que derivará el cliente de los servicios del abogado; la habilidad que requiere conducir el caso adecuadamente; la contingencia de la compensación, y la dificultad y complejidad de las cuestiones planteadas. Canon 24 del Código de Ética Profesional, *supra*; *In re Díaz Lamoutte*, supra.

■ Ahora bien, a pesar de que es deseable que los acuerdos de honorarios profesionales se pacten por escrito y que éstos se redacten "libre de ambigüedades y con óptima claridad en sus términos, consignando las contingencias previsibles que pudieran surgir durante el transcurso del pleito", *Colón v. All Amer. Life & Cas. Co.*, supra, pág. 774, esto no significa que los contratos verbales de honorarios de abogado no sean exigibles ni que un contrato de honorarios ambiguo no sea válido y susceptible de interpretación.

## III

*El contrato de arrendamiento de servicios*

■ El contrato de servicios profesionales de abogado es, como regla general, un contrato de arrendamiento de servicios, Art. 1473 del Código Civil, 31 L.P.R.A. sec. 4111. Éste, aunque *un contrato eminentemente consensual* que se perfecciona con el mero consentimiento, es deseable que se reduzca a escrito. Canon 24 del Código de Ética Profesional, *supra*. "En él una de las partes se obliga a desplegar, respecto [a] la otra, una determinada *actividad* polarizada en el mismo trabajo." Es, además, un contrato *conmutativo* "puesto que la *retribución* se da precisamente por la activi-

dad desplegada, actuando una como causa recíproca de la otra . . . [y por último también] es, por esencia, de *duración temporal*". (Énfasis en el original.) F. Puig Peña, *Compendio de Derecho Civil Español*, 3ra ed. rev., Madrid, Eds. Pirámide, 1976, Vol. IV, Cap. XCV, pág. 140; M. Albaladejo, *Curso de derecho civil español, común y foral*, Barcelona, Ed. Bosch, 1977, Sec. 110, págs. 452–453.

No afecta su validez el que en el mismo no medie precio cierto, ya que la determinación de la cuantía puede ser establecida posteriormente por la costumbre o los usos de la profesión. J. Puig Brutau, *Fundamentos de Derecho Civil*, 2da ed. rev., Barcelona, Ed. Bosch, T. II, Vol. 2, págs. 434–436. Sin embargo, tanto los cánones de ética profesional como la jurisprudencia, indican que la mejor práctica la constituye el acordar, por escrito y con claridad, los honorarios y designar una cantidad fija o una fórmula para computarla o determinarla. Cánones 24 y 25 del Código de Ética Profesional, *supra*; *Colón v. All Amer. Life & Cas. Co.*, supra.

## IV

*La interpretación de los contratos*

La controversia en el caso de autos se circunscribe a la determinación del sentido exacto del acuerdo sobre honorarios contingentes pactado en el contrato de arrendamiento de servicios profesionales. Las reglas generales sobre interpretación de contratos son de aplicación a este tipo de contrato, en tanto y en cuanto sean compatibles con los cánones de ética profesional. Nuestro Código Civil consagra la teoría subjetiva de la interpretación de los contratos. Esto entraña el indagar sobre "la voluntad real de las partes, más aún que la voluntad declarada". D. Espín Cánovas, *Manual de Derecho Civil Español*, 4ta ed., Madrid, Ed. Rev. Der. Privado, 1957, Vol. III, Sec. 6, Cap. I, pág. 424.

La interpretación de un contrato conlleva el reconstruir el sentido de una declaración negocial para conseguir los efectos deseados por las partes. La interpretación "debe ser entendida primariamente como el medio de colegir la voluntad a través de los signos empleados para expresarla". L. Díez-Picazo y A. Gullón, *Sistema de Derecho Civil*, 4ta ed., Madrid, Ed. Tecnos, 1984, Cap. 10, pág. 148.

El Código Civil contiene una serie de preceptos que el juez utilizará para realizar su función interpretativa. Así, tenemos que el Art. 1234 del Código Civil, 31 L.P.R.A. sec. 3472, dispone que para buscar "la intención de los contratantes, deberá atenderse principalmente a los actos de éstos, coetáneos y posteriores al contrato". Este precepto es de carácter demostrativo no taxativo y, por lo tanto, no impide que se tomen en consideración actos anteriores a la contratación. Después de todo, los actos preparativos del contrato son muchas veces más imparciales que los posteriores. Espín Cánovas, *op. cit.*, pág 425.

Ahora bien, la declaración de voluntad de las partes "no puede considerarse de una manera despersonalizada; es lazo de comunicación y de unión entre dos personas". Díez-Picazo y Gullón, *op. cit.*, pág. 148. Esto requiere que para determinar esa voluntad se tomen en consideración la ocasión, las circunstancias, las personas y el acuerdo que se intentó llevar a cabo. En relación con el contrato en sí, sus cláusulas deben interpretarse unas con otras. Cuando cualquiera de ellas admita diversos sentidos, debe entenderse en el más adecuado para que produzca el efecto deseado. Arts. 1237 y 1236 del Código Civil, 31 L.P.R.A. secs. 3475 y 3474.

Recientemente, en *Negrón Rivera y Bonilla, Ex parte*, 120 D.P.R. 61 (1987), citamos con aprobación las siguientes expresiones de Díez-Picazo en relación con la interpretación de los contratos:

[Éstos] "deben interpretarse de acuerdo con la buena fe . . . [que es] un [*standard*] de conducta arreglada a los imperativos éticos exigibles de acuerdo con la conciencia social imperante . . . . Los contratos han de ser interpretados presuponiendo una lealtad y una corrección en su misma elaboración, es decir, *entendiendo que las partes al redactarlos quisieron expresarse según el modo normal propio de gentes honestas y no buscando circunloquios, confusiones deliberadas u oscuridades* . . . . El contrato debe ser interpretado de manera que el sentido que se le atribuya sea el más conforme para llegar a un desenvolvimiento leal de las relaciones contractuales y para llegar a las consecuencias contractuales exigidas conforme a las normas éticas . . . ". (Énfasis suplido.) L. Díez-Picazo, *Fundamentos del Derecho Civil Patrimonial*, Madrid, Ed. Tecnos, 1979, Vol. I, Cap. XI, Sec. 45, págs. 251–252.

# V

*Conclusión*

Analicemos los hechos de este caso con fundamento, tanto en las normas de derecho como en los preceptos éticos discutidos previamente. Los contratantes son, de una parte, un conocido bufete de abogados y, de otra, los señores Rojo, unos exitosos hombres de negocio, conocedores del mundo de las finanzas y familiarizados con el mecanismo de la negociación. La situación con la que se confrontaban los señores Rojo cuando suscribieron el contrato en cuestión era la de una acción judicial por parte del Chase por cobro de una deuda ascendente a $1,671,500, más los respectivos intereses. Para el 2 de julio de 1979, éstos sumaban $775,775 y continuaban devengándose, a razón de $583.38 diarios. Ante esta situación, que las partes admiten era seria y que entrañaba cuestiones complejas,(5) resulta obvio que los señores Rojo buscaran el asesoramiento de una firma de abogados de prestigio que pudiese enfrentarse efectivamente con los abogados del Chase, una poderosa institución financiera.

---

(5) Alegato en réplica del recurrido Agustín Rojo García, pág. 30.

Los señores Rojo también aceptan que los servicios que les brindó el licenciado Látimer fueron de excelencia y calidad.(6) El licenciado Látimer desarrolló una efectiva estrategia para intervenir con el problema. Primero, puso a negociar a los Sres. Delio y Agustín Rojo bajo su dirección. Luego, cuando esto no resultó y los señores Rojo fueron demandados, reconvino y presentó demanda aparte en reclamo de sumas respetables, con fundamentos aparentemente sólidos, puesto que fortalecieron la posición de los señores Rojo en la negociación y lograron la transacción que deseaban.

Los señores Rojo y el licenciado Látimer, antes de suscribir el contrato en controversia, discutieron distintas alternativas posibles de transacción. Entre ellas se encontraba la que finalmente se aceptó por considerarla los señores Rojo como la más favorable para ellos: entregar la finca propiedad de la Corporación a cambio de que el Chase considerara toda la deuda saldada —principal más intereses— y relevara a la Corporación y a los señores Rojo como garantizadores.

Estas fueron las circunstancias que precedieron el acuerdo que hoy nos toca interpretar. También resulta importante que tomemos en consideración que fueron los señores Rojo los que solicitaron pactar honorarios contingentes. Ni los señores Rojo alegan ni de los documentos sometidos surge que fueran presionados de manera alguna para suscribir el contrato de honorarios contingentes. Pactaron, voluntariamente, que se le pagaría al bufete de Ramírez, Segal & Látimer "un 20% de aquellas sumas en que el principal reclamado por Housing Investment Corp. se [redujera, y que] . . . [e]l 20% mencionado no se aplicar[ía] a cualesquier reducción en los intereses reclamados por Housing Investment Corporation". *Exhibit* AA, pág. 1. Como hombres ave-

---

(6) Alegato en réplica del recurrido Agustín Rojo García, pág. 30.

zados en los negocios, los señores Rojo evaluaron e hicieron un juicio crítico de toda la situación. Concluyeron que les convenía lo acordado, luego de lo cual procedieron a suscribir lo que obviamente consideraron un pacto razonable. De estos hechos surge con evidente claridad que tanto los señores Rojo como el licenciado Látimer eran conscientes de que una de las posibles alternativas de transacción era la entrega de la finca, único activo de la Corporación. Los contratantes eran personas versadas en el mundo de los negocios y de las finanzas. Como tales, tenían que saber que una transacción de este tipo podría resultar en la reducción del principal reclamado y que tal reducción podría ser sustancial. No era necesario que se detallaran en el contrato todas las posibles formas y alternativas de transacción capaces de producir una reducción del principal adeudado. Ni las normas de derecho ni los preceptos de los cánones de ética profesional exigen tal cosa. Leído el contrato de forma integral, unas cláusulas con otras y a la luz de las circunstancias que dieron lugar al acuerdo y a las sucedidas con posterioridad al mismo, surge con evidente claridad que fue la intención de las partes incluir, dentro de la contingencia pactada, la alternativa finalmente acordada.

Las partes pactaron libre y voluntariamente y con pleno conocimiento de la obligación que asumían, que además del pago de $50 por hora por trabajo realizado, al bufete se le pagaría el veinte por ciento (20%) de aquella suma en que el principal reclamado se redujese. Si la entrega de la finca produjo esta reducción, la contingencia se dio y procede el pago de lo pactado. Los señores Rojo aceptaron la oferta del Chase. La forma y manera en que finalmente se estructuró la transacción en nada afecta el hecho de que la contingencia pactada en efecto se dio.

Debido a que el tribunal de instancia desestimó la demanda mediante sentencia sumaria, éste no llegó a deter-

minar el valor de la finca, paso previo esencial para concluir si efectivamente hubo la reducción pactada en la cláusula de contingencia.[7] Tampoco fue necesario que determinara si, bajo las circunstancias específicas de este caso, debía considerarse el valor de la labor realizada por el segundo bufete de abogados, Laffitte & Domínguez, de completar el trabajo y concluir la transacción al computar los honorarios adeudados al bufete de Ramírez, Segal & Látimer.[8]

Por todo lo antes expuesto, *procede que se dicte sentencia revocando la sentencia dictada por el Tribunal Superior, Sala de San Juan, y que se devuelva el caso para que continúen los procedimientos de forma compatible con esta opinión.*

El Juez Asociado Señor Negrón García concurre con el resultado sin opinión escrita.

---

[7] En relación con la razonabilidad de los honorarios, cabe señalar que la intervención moderadora del tribunal con la autonomía contractual de las partes sólo se da *"en circunstancias extraordinarias, facultad dimanante del [Art. 1210 del Código Civil, 31 L.P.R.A. sec. 3375] que ha de ejercerse con extrema cautela y patente justificación* por su efecto lesivo a la estabilidad de los contratos y a la seguridad jurídica". (Énfasis suplido.) *López de Victoria v. Rodríguez*, 113 D.P.R. 265, 271 (1982).

[8] Bajo ciertas circunstancias, en otras jurisdicciones se ha tomado en consideración la labor subsiguiente del abogado que completó el trabajo al hacer el cómputo de los honorarios contingentes adeudados. Por ejemplo, en Louisiana, jurisdicción de tradición civilista influenciada por las normas del derecho común, se ha resuelto lo siguiente: que un abogado cuyo contrato de servicios profesionales a ser pagados en forma contingente lo da por terminado el cliente sin justa causa, es acreedor al pago de honorarios contingentes. Estos se dividen a prorrata entre los abogados que trabajaron en el caso, de acuerdo con las normas establecidas en el Código de Responsabilidad Profesional. *Saucier v. Hayes Dairy Products, Inc.*, 373 So. 2d 102 (La. 1979). Para la posición contraria, véase *Kaushiva v. Hutter*, 454 A.2d 1373 (D.C. App.), *cert.* denegado, 464 U.S. 820 (1983).