EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| In re:<br><br>    Juan A. Barlucea Cordovés | Querella<br><br>2001 TSPR 147<br><br>155 DPR _____ |

Número del Caso: CP-1999-15

Fecha: 15/octubre/2001

Oficina del Procurador General:

Lcda. Cynthia Iglesias Quiñones
Procuradora General Auxiliar

Abogado de la Parte Querellada:
Lcdo. Ricardo Morales Maldonado

Materia: Conducta Profesional
       (La suspensión es efectiva a partir del 26 de octubre de 2001, fecha
       en que se le notificó al abogado el Per Curiam y Sentencia)

Este documento constituye un documento oficial del Tribunal
Supremo que está sujeto a los cambios y correcciones del proceso
de compilación y publicación oficial de las decisiones del
Tribunal. Su distribución electrónica se hace como un servicio
público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re:

Juan A. Barlucea Cordobés

CP-1999-15

PER CURIAM

San Juan, Puerto Rico a 15 de octubre de 2001

El 8 de junio de 1999, la Oficina del Procurador General (en adelante Procurador) presentó ante este Tribunal un informe sobre la conducta profesional de los Lcdos. Juan A. Barlucea Cordovés y Manfredo E. Lespier García (en adelante abogados querellados), en su desempeño como representantes legales de la Sra. María I. Rivera Piñeiro.

Examinada la querella instada por el Procurador y las contestaciones sometidas por los abogados querellados, designamos al Hon. Agustín Mangual Hernández Comisionado Especial (en adelante

Comisionado) para que celebrase la vista y rindiera su informe.

El 11 de mayo de 2001, luego de celebrada la vista, el Comisionado emitió su Informe. El 18 de junio de 2001, el Procurador presentó "Moción en Torno al Informe del Comisionado Especial" mediante la cual objetó varias determinaciones de hecho del Informe del Comisionado.

Con el beneficio del Informe del Comisionado Especial y los demás documentos que obran en el expediente, resolvemos.

I

El 22 de noviembre de 1993, la señora María de los Ángeles Rivera Piñeiro contrató los servicios de los Lcdos. Juan A. Barlucea Cordovés y Manfredo E. Lespier García para que la orientaran y le tramitaran una participación en la herencia dejada por su difunto esposo Francisco López Sánchez. El fenecido estuvo casado en segundas nupcias con la señora Rivera Piñeiro. Su primer matrimonio fue con la Sra. Evagenlina Ruiz Cortés, con la cual procreó tres (3) hijos de nombres; Juan Ramón, Federico y Teresa, todos de apellidos López Ruiz.

La señora Rivera Piñeiro interesaba que los abogados querellados negociaran con la primera esposa de su difunto esposo y los tres (3) hijos habidos durante el matrimonio para que no instaran una acción judicial en su contra sobre división de herencia.

El pacto de honorarios entre dichos abogados y la señora Rivera Piñeiro fue uno verbal. Según el Informe del Comisionado, ésta les pagaría el quince por ciento (15%) de la totalidad del valor de los bienes que se le adjudicaran al dividirse la herencia. Los abogados querellados también le exigieron un adelanto de dos mil dólares ($2,000) para cubrir los gastos de todas las gestiones pertinentes al caso. De esta suma, la señora Rivera Piñeiro pagó al contratarlos la cantidad de trescientos dólares ($300). Además, les entregó un expediente con varios documentos.

Así las cosas, el 3 de marzo de 1995, la señora Rivera Piñeiro recibió de parte de los querellados copia de una demanda que fuera instada en su contra el 27 de febrero de 1995 en el Tribunal de Primera Instancia, Sala

Superior de Bayamón, por la primera esposa del fenecido Francisco López Sánchez, Evangelina Ruiz Cortés, y la Sucesión de éste en la cual solicitaban la división de herencia. Surge del Informe del Comisionado que, al momento de presentarse la demanda, los abogados querellados no habían hecho gestión alguna en los tribunales para cumplir con su deber profesional para con la señora Rivera Piñeiro. Además, se señaló, que no fue sino hasta el 30 de junio de 1995, y luego de haber solicitado una prórroga, que éstos contestaron la demanda.[1]

Luego de varios trámites procesales ante el foro de instancia, el caso culminó en una Sentencia por Estipulación el 2 de marzo de 1998.[2]

Así las cosas, el 31 de agosto de 1998, los abogados querellados, mediante comunicación escrita, le informaron a la señora Rivera Piñeiro que la suma recibida por concepto de su participación en la partición de la herencia ascendía a $191,320, y que a la luz de lo pactado, ella les debía la cantidad total de $28,698 de los cuales ya había abonado $10,000. En los $191,320 los abogados incluyeron la suma de $94,000 correspondiente al seguro que le dejó el fenecido a la señora Rivera Piñeiro y que le fue entregada por la Compañía Travelers el 17 de marzo de 1993, es decir, antes de que ésta contratara los servicios de los abogados querellados.

---

[1] Por otra parte, del Informe del Procurador y de los documentos que lo acompañan, surge que los abogados querellados alegaron que hicieron gestiones por la querellante desde el mismo momento en que asumieron su representación legal. Sin embargo, el Procurador indicó que los documentos revelan que la actividad profesional y las horas facturada comenzaron desde el 5 de mayo de 1995.

El Procurador también sostuvo que la representación legal de la ex esposa del difunto y su sucesión, Lcda. Iris Marrero García, le suministró, vía fax, copia de tres cartas dirigidas al licenciado Lespier García en las que ésta solicitaba reunirse con los abogados querellados con relación al caso de la herencia. Las cartas tienen fechas de 30 de noviembre de 1993, 18 de enero de 1994 y 23 de febrero de 1994. El contenido de esas cartas revela que la abogada hizo varios intentos de reunirse con los abogados hasta que el 27 de febrero de 1995, no tuvo más alternativa que presentar la demanda sobre división de herencia.

[2] Según el Comisionado, a esa fecha todavía no se había vendido una propiedad que era parte de la herencia a dividir. No se había resuelto una reclamación de deuda contributiva del Departamento de Hacienda contra el difunto Francisco López Sánchez. Tampoco se había liquidado la sociedad legal de gananciales que existía entre el difunto y su primera esposa, Evangelina Ruiz Cortés. Por último, no se habían cancelado dos (2) pagarés hipotecarios devueltos por la Coopertativa de Ahorro y Crédito de Arecibo

La señora Rivera Piñeiro entendió que la cantidad cobrada era una excesiva e irrazonable y solicitó a los abogados querellados un desglose de los $28,698. También, entendió que dentro del cómputo se habían incluido otras partidas que no pertenecían a la división de la herencia.

Posteriormente, el 15 de diciembre de 1998, la señora Rivera Piñeiro presentó la queja que dio origen a los hechos aquí relatados y que hoy nos ocupan. Cabe señalar que ésta indicó que al momento de presentar la queja, los abogados querellados aún no le habían informado el desglose de la factura a cobrar. Finalmente, señaló que, a pesar de no haber finalizado el caso de partición de herencia, éstos le entregaron el expediente, sin haber renunciado a la representación legal.

En vista de lo anterior, en noviembre de 1998, el Lcdo. Hernán Cintrón Cruz se hizo cargo de la representación de la señora Rivera Piñeiro. Surge del Informe del Comisionado que éste trató de llegar a un acuerdo con uno de los abogados querellados, licenciado Lespier García y convencerlo de que los $10,300 que ya había recibido de la señora Rivera Piñeiro era una cantidad razonable por el servicio brindado. Sin embargo, el licenciado Lespier García rechazó la propuesta.[3]

Finalmente, también surge del Informe del Comisionado que el licenciado Barlucea Cordovés, al testificar en la vista, hizo constar que de los mencionados $10,000 pagados por la señora Rivera Piñeiro, el licenciado Lespier García le entregó la suma de $2000. Declaró que se daba por satisfecho con dicha cantidad y que no tenía ulterior interés en reclamar honorarios adicionales contra ésta.

II

---

y que se le habían perdido a la sociedad legal de gananciales de López Sánchez con la querellante.

[3] Por haber fallecido el Lcdo. Manfredo E. Lespier García el 9 de noviembre de 2000, la querella presentada en su contra se ha tornado académica. En vista de lo anterior, el 24 de agosto de 2001, este Tribunal, mediante resolución, ordenó su archivo.

Los Cánones de Ética profesional constituyen los principios éticos en virtud de los cuales la clase togada debe guiar su conducta profesional. Ramírez, Segal & Látimer v. Rojo Rigual, 123 D.P.R. 161, 171 (1989).

Es conforme a estos principios que nos corresponde evaluar la conducta profesional del Lcdo. Juan A. Barlucea Cordovés como representante legal de la señora Rivera Piñeiro. Veamos.

III

Entre las determinaciones que hiciera el Comisionado salta a la vista que el licenciado Barlucea Cordovés le cobró a la señora Rivera Piñeiro la suma de $28,698 por los servicios profesionales prestados. Es decir, cobró el 15% de los alegados $191,320 recibidos por ésta en el caso de su participación de la partición de herencia. Cabe señalar sin embargo, que en dicha cuantía se incluyó la suma de $94,000 que por concepto de una póliza de seguros había recibido la señora Rivera Piñeiro. Esta partida correspondía a un seguro que su difunto esposo tenía con la Compañía Travelers en el cual la había designado como beneficiaria. El 17 de marzo de 1993, la Travelers le envió un cheque por la suma de $94,000, el cual fue recibido antes de que los abogados querellados asumieran la representación legal de la señora Rivera Piñeiro.

Reiteradamente hemos expresado que la cuantía que recibe un beneficiario de una póliza de seguro de vida, no forma parte de su caudal relicto. Méndez v. Morales, 142 D.P.R. 26, 39 (1996). Una vez muere el asegurado, el beneficiario adquiere un derecho propio y distinto de aquel perteneciente al tomador del seguro sobre el producto de la póliza. En esta etapa la reclamación del beneficiario es superior a la de cualquier otro con interés en esa suma de dinero. Pilot life Ins. Co. v. Crespo Martínez, 136 D.P.R. 624, 636 (1994); Fernández Vda. de Alonso v. Cruz Batiz, 128 D.P.R. 493 (1991).

Sabido es que los miembros de la profesión legal tienen la ineludible obligación de **"defender los intereses del cliente diligentemente"**. Canon 18 de Ética Profesional 4 L.P.R.A. Ap. IX. Es decir, **"con un trato**

**profesional caracterizado por la mayor capacidad, la más devota lealtad y la más completa [honestidad] y honradez.**" Véanse: In re Acosta Grubb, 119 D.P.R. 595, 602 (1987); In re Arana Arana, 112 D.P.R. 838, 843 (1982); e In re Cardona Vázquez, 108 D.P.R. 6, 18 (1978).

De otra parte, el deber de sinceridad y honradez que impone el Canon 35 de Ética Profesional, supra, es *erga omnes*, lo que incluye no utilizar medios incompatibles con la verdad en la relación del abogado con sus representados. In re Irrizarry Vega, PC de 24 de agosto de 2000, 2000 JTS 140, pág. 58.

De lo anterior se desprende con meridiana claridad que el desempeño profesional del licenciado Barlucea Cordovés dista mucho de ser uno adecuado, responsable y efectivo, es decir, su conducta violó el Canon 18 de Ética Profesional, supra. No tan solo fue negligente al incluir como partida para el cómputo de sus honorarios de abogado la suma de los $94,000 antes mencionada que correspondía al seguro de vida, sino que fue **deshonesto** al pretender cobrar sus honorarios sobre dicha partida a pesar de que ésta no formaba parte de la herencia y había sido recibida por la señora Rivera Piñeiro antes de que éste asumiera la representación legal.

En consecuencia, concluimos que a la luz de estas circunstancias, la conducta del licenciado Barlucea Cordovés además de no caracterizarse por ser una que refleja conocimiento cabal de las normas legales, no fue una sincera y honesta. Véanse; Canon 18 y 35 de Ética Profesional, supra; e In re Irrizarry Vega, supra. Tampoco desplegó la responsabilidad, diligencia y eficacia que exigía ostentar la representación legal de la señora Rivera Piñeiro. Véase, Canon 18 de Ética Profesional, supra. Es de notar que ésta contrató sus servicios el 22 de noviembre de 1993, sin embargo, no fue sino hasta luego de la presentación de la demanda de división de herencia por los otros coherederos, el 27 de febrero de 1995, que éste comenzó a realizar alguna gestión en torno al caso de partición de herencia.

IV

El contrato de servicios profesionales de un abogado, como norma general, puede ser catalogado como uno de arrendamiento de servicios. Art.

1473 del Código Civil, 31 L.P.R.A. sec. 4111. Véase, además, Ramírez Segal & Látimer v. Rojo Rigual, supra, pág. 172. También puede ser considerado como una variante del contrato de arrendamiento. A estos efectos véanse, Art. 1434, supra, 31 L.P.R.A. sec. 4013 y Pérez v. Col. Cirujanos Dentista de P.R., 131 D.P.R. 545, 552 (1992). Sin embargo, resulta importante destacar que el contrato de servicios profesionales de abogado, distinto a cualquier otro convenio de arrendamientos de servicios, responde a las **"inexorables exigencias éticas, muy particulares de nuestra profesión."** Nassar Rizek v. Hernández, 123 D.P.R. 360, 369 (1989). Es por ello que se considera uno de naturaleza sui géneris. Nassar Rizek v. Hernández, supra.

El Canon 24 de Ética Profesional, supra, identifica los factores a tomar en consideración al momento de fijar los honorarios de abogado. Entre éstas se encuentran, la naturaleza de la gestión, la novedad y la dificultad del asunto a resolver, la habilidad y el conocimiento necesarios para conducir el caso adecuadamente, el tiempo y trabajo requerido, los honorarios que se acostumbran a cobrar por servicios similares, la cuantía envuelta, la contingencia o certeza de la compensación, y la naturaleza de la gestión profesional, entre otros.

Así pues, al iniciar su gestión profesional, todo abogado debe tener en mente la advertencia de que "[e]s **deseable** que se llegue a un acuerdo sobre los honorarios a ser cobrados por el abogado al inicio de la relación profesional y que dicho acuerdo sea reducido a escrito". Canon 24 de Ética Profesional, supra. Precisamente, para evitar problemas como el que hoy enfrentamos, las controversias con los clientes sobre la compensación por servicios prestados, es que hemos enfatizado la deseabilidad de que el acuerdo sea por escrito. In re Castro Mesa et al., 131 D.P.R. 1037 (1992); Ramírez Segal & Látimer v. Rojo Rigual, supra, pág. 171 (1989).

Ciertamente lo anterior no significa que los contratos verbales están prohibidos o no sean válidos, "ni que un contrato de honorarios ambiguo no sea válido y susceptible de interpretación." Ramírez Segal & Látimer v. Rojo Rigual, supra, pág. 172. Sin embargo, éstos tienen mayores riesgos de crear malentendidos, cuando tanto el cliente como el abogado nieguen lo

pactado o lo alteren. Véase, lo discutido en <u>Nasar Rizek</u> v. <u>Hernández</u>, supra, págs. 372-373.

De otra parte, en casos como el que nos ocupa, donde se pactan honorarios contingentes, el abogado o abogada tiene la ineludible obligación de explicar al cliente las consecuencias de este tipo de pacto. Canon 24, supra. Véanse: <u>Pérez</u> v. <u>Col. Cirujanos Dentistas de P.R.</u>, supra, pág. 554 y <u>Ramírez, Segal & Látimer</u> v. <u>Rojo Rigual</u>, supra pág. 171. Sólo si el cliente así lo desea, luego de entender las consecuencias, es que deben pactarse los honorarios contingentes, siempre teniendo en cuenta que éstos deben ser beneficiosos para el cliente. <u>In re: Norma Concepción Peña</u>, PC de 20 de junio de 2001, 2001 JTS 97, 1475.

No cabe duda que las discrepancias de cobro en este caso se hubiesen minimizado si el acuerdo de honorarios se hubiese plasmado en un escrito "libre de ambigüedades y con óptima claridad en sus términos, consignando las contingencias previsibles que pudieran surgir durante el transcurso del pleito." Véase, <u>Colón</u> v. <u>ALL Amer. Life & Cas. Co.</u>, 110 D.P.R. 772, 773 (1981).

De otra parte, no existe excusa alguna para que el querellado Barlucea Cordovés pretendiera cobrar honorarios contingentes sobre la cuantía recibida por su cliente por concepto de los beneficios de una póliza de seguros, que para agravar la situación, fue recibida antes de que se contrataran sus servicios.

A tenor con lo antes expuesto, surge con meridiana claridad que el Lcdo. Juan A. Barlucea Cordovés violó los Cánones, 18, 35 y 24 de Ética Profesional. Advertimos que el hecho de que éste abogado se dio por satisfecho con la cantidad de $2000 que cobró de lo adelantado por la señora Rivera Piñeiro y que manifestó no tener ulterior interés en cobrar el resto de los $28,698, <u>bajo ninguna circunstancia lo exime de responsabilidad</u>. Sin embargo, podemos considerar dicho gesto como un atenuante.

IV

Tomando en consideración todo lo anterior, suspendemos inmediatamente al Lcdo. Juan A. Barlucea Cordovés por un término de un (1) mes y hasta que otra cosa disponga este Tribunal. Se le apercibe que de incurrir en violaciones similares en el futuro seremos más severos en la imposición de sanciones disciplinarias.

El Alguacil de este Tribunal deberá incautarse del sello y la obra notarial del abogado suspendido, debiendo entregar la misma a la Directora de Inspección de Notarías para la correspondiente investigación e informe a este Tribunal.

Se le impone al querellado Barlucea Cordovés el deber de notificar a todos sus clientes de su presente inhabilidad de seguir representándolos, les devuelva cualesquiera honorarios recibidos por trabajos no realizados e informe oportunamente de su suspensión a los distintos foros judiciales y administrativos del país.

Finalmente, deberá certificarnos en treinta (30) días a partir de la notificación de esta Opinión Per Curiam el cumplimiento de estos deberes, notificando también al Procurador General.

Se dictará sentencia de conformidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re:

Juan A. Barlucea Cordobés

CP-1999-15

SENTENCIA

San Juan, Puerto Rico a 15 de octubre de 2001

Por los fundamentos expuestos en la anterior Per Curiam, se dicta sentencia separando de forma inmediata por el término de un (1) mes del ejercicio de la profesión de abogado al Lcdo. Juan A. Barlucea Cordobés y hasta que otra cosa disponga este Tribunal. Se le apercibe que de incurrir en violaciones similares en el futuro seremos más severos en la imposición de sanciones disciplinarias.

Se le impone el deber de notificar a todos sus clientes de su presente inhabilidad de seguir representándolos, de devolverle cualesquiera honorarios recibidos por trabajos no realizados, e informarle oportunamente de su suspensión a los distintos foros judiciales y administrativos del País. Además, deberá certificarnos dentro del término de treinta (30) días, contados a partir de la notificación de esta Opinión Per Curiam, el cumplimiento de estos deberes, notificando también al Procurador General.

El Alguacil de este Tribunal deberá incautarse del sello y la obra notarial del abogado suspendido,

debiendo entregar la misma a la Directora de Inspección de Notarías para la correspondiente investigación e informe a este Tribunal.

Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. Los Jueces Asociados señores Rebollo López y Rivera Pérez limitarían la sanción a una severa amonestación. EL Juez Asociado señor Fuster Berlingeri no intervino.


Isabel Llompart Zeno
Secretaria del Tribunal Supremo