JEAN DAVIS h/n/c BEST SELLERS REALTY, demandante y recurrida, *v.* HORACIO DAUBÓN, su esposa, SEÑORA DAUBÓN, y OTROS, demandados y peticionarios.

*Número:* CE-91-363          *Resuelto:* 30 de abril de 1996

*José A. Bravo Abréu*, abogado de la parte peticionaria; *Félix A. Ramos Cabán*, abogado de la parte recurrida.

Sala Especial integrada por su Presidente el Juez Asociado Señor Hernández Denton y los Jueces Asociados Señores Fuster Berlingeri y Corrada Del Río.

— o —

Opinión disidente del Juez Asociado Señor Corrada Del Río.

Nos corresponde resolver si erró el Tribunal Superior, Sala de San Juan (Hon. Arnaldo López Rodríguez, Juez), al declarar con lugar una demanda presentada por la parte aquí recurrida en reclamo de una comisión por servicios prestados que había sido estipulada en virtud de un contrato de corretaje de bienes raíces. Concluyó dicho foro que, habiéndose perfeccionado el contrato de compraventa con respecto al cual estuvo dirigida la actividad de la corredora, Sra. Jean Davis, y no habiéndose consumado éste por las actuaciones del vendedor, Sr. Horacio Daubón, procedía el pago de la comisión pactada a cambio de las gestiones realizadas por la corredora.

La sentencia emitida por este Tribunal revoca la sentencia recurrida tras sostener que el referido contrato de compraventa nunca llegó a perfeccionarse, por lo cual no surgió el derecho a cobrar la comisión pactada. No obstante, luego de un estudio detenido de los autos del caso, y al amparo de

la normativa aplicable, no podemos suscribir la posición asumida por la mayoría de este Tribunal. Los hechos del caso se detallan a continuación.

## I

El 21 de junio de 1987 el Sr. Horacio Daubón firmó un contrato de corretaje titulado "Open Sales Agreement", mediante el cual autorizaba a la Sra. Jean Davis h/n/c Best Sellers Realty a gestionar la venta de una propiedad inmueble situada en Palmas del Mar, Humacao. El precio acordado para la venta fue de cien mil dólares ($100,000). Se pactó, además, que si la corredora lograba conseguir un comprador sería acreedora de una comisión de un seis por ciento (6%) del precio de venta estipulado. Esta comisión sería pagada en la fecha del otorgamiento de la correspondiente escritura de compraventa.

En específico, el contrato otorgado entre las partes dispuso lo siguiente:

> You are authorized to find a purchaser for the property described below *at the price and terms stated below, or at any other price or terms to which I may agree.*

> You will advise me in writing of the names of the buyer prospects with whom you have discussed this property or to whom you have shown this property, thus registering them as clients.

> *If you are successful in finding a purchaser for this property or if any of the prospects of which we have received notice in writing purchases this property at any future date, we agree to pay you a commission of 6 per cent of the total price at which the property is sold, payable on the date of the execution of the deed of sale.* The period of this agreement shall be for *OPEN* months from the date of signature of this agreement. (Énfasis suplido.) Apéndice, pág. 29.

Transcurrido un (1) año de la firma del contrato de corretaje, la Sra. Jean Davis consiguió un comprador para la propiedad. El potencial comprador firmó un contrato (*Con-*

*tract of Sale*) que acordaba el pago de cien mil dólares ($100,000) por el inmueble. Ello mediante un depósito inicial de cinco mil dólares ($5,000), que serían pagados en el acto, y el resto sería pagado no más tarde de 11 de septiembre de 1988. Además, se dispuso que dicho contrato debería ser aprobado por el vendedor a más tardar el 10 de julio de 1988. De no ser aprobado se devolvería el depósito al comprador.[1]

El 5 de julio de 1988 la corredora remitió al Sr. Horacio Daubón el contrato (*Contract of Sale*) firmado por el posible comprador. Además, le solicitó que la copia le fuera devuelta firmada y que le remitiera la información necesaria para la redacción de la correspondiente escritura de compraventa. Sin embargo, el 7 de julio de 1988 el señor Daubón envió una carta a la corredora en que informó que, debido al aumento de valor que había sufrido la propiedad en el último año, no podía venderla por el precio original de cien mil dólares ($100,000). Sostuvo que había decidido vender el inmueble por la suma de ciento doce mil dólares ($112,000).

En consecuencia, la corredora se comunicó con el comprador y le informó lo sucedido. El comprador rechazó la nueva oferta por no estar de acuerdo con el nuevo precio. Posteriormente, la corredora envió varias comunicaciones al señor Daubón para informarle el rechazo del comprador y requerirle el pago de la comisión que había sido convenida en el contrato de corretaje.

El 26 de agosto de 1988 el representante legal del señor Daubón le envió una carta a la corredora en la cual denegaba el reclamo de ésta al pago de la comisión. Por su parte, la corredora contestó dicha carta. Indicó que daba por terminados sus servicios de corretaje y procedió a devolver al comprador el depósito de cinco mil dólares

---

[1] En específico se dispuso lo siguiente:

"This Contract is subject to the approval by the sellers no later that July 10, 1988. When so approved the contract shall be binding on both parties. If not approved, earnest money shall be returned to purchaser." Apéndice, pág. 31.

($5,000) que éste había hecho para la compra de la propiedad.

Así las cosas, el 19 de enero de 1989 Jean Davis h/n/c Best Sellers Realty presentó ante el entonces Tribunal de Distrito, Sala de San Juan, una demanda contra el Sr. Horacio Daubón, su esposa y la sociedad legal de gananciales compuesta por ambos. En ella alegó, en síntesis, que la venta de la propiedad se había frustrado por la sola culpa de la parte demandada, razón por la cual tenía derecho a reclamar la suma de seis mil dólares ($6,000) en concepto de comisión sobre el precio de cien mil dólares ($100,000) previamente fijado para la venta.

Oportunamente, los demandados contestaron la demanda en la cual negaron el derecho a la comisión reclamada. Alegaron que el negocio no se había completado por culpa de la demandante y que al no haberse completado la transacción de compraventa ni otorgado las escrituras correspondientes, ésta no tenía derecho a la comisión pactada. Además, presentaron una moción de sentencia sumaria. La parte demandante contestó la moción presentada y, a su vez, solicitó una sentencia sumaria a su favor.

El 7 de febrero de 1990 el Tribunal de Distrito dictó sentencia en la cual declaró sin lugar la demanda en todas sus partes. Resolvió dicho foro que el contrato de corretaje había sido rescindido por la propia demandante, poniendo así fin a cualquier otra negociación o alternativa que pudiera surgir para materializar la compraventa del inmueble, resultando, por lo tanto, impedida de exigir el pago de la comisión que había sido convenida. Interpretó, además, que la comisión pactada en el contrato de corretaje se encontraba supeditada a que se llevara a cabo una compraventa en la que se hubiesen firmado las escrituras correspondientes.

Inconforme con tal dictamen, la demandante presentó un escrito de apelación ante el entonces Tribunal Superior, Sala de San Juan. El 6 de mayo de 1991 el Tribunal Supe-

rior dictó la sentencia que revocó la sentencia dictada por el Tribunal de Distrito y condenó a la parte demandada a pagar a la corredora la suma de seis mil dólares ($6,000) en concepto de la compensación convenida, más el interés legal. En síntesis, dicho foro sostuvo que la aceptación de una oferta completa por el comprador había perfeccionado el contrato, pero que "la causa principal, el factor determinante para que el contrato de compraventa no se consumara, fue el retiro que hizo el vendedor de la oferta original y el cambio en el precio y condiciones de la nueva oferta". (Escolio omitido.) En vista de ello, concluyó que el vendedor demandado no podía oponerse a pagarle la comisión a la corredora alegando que el pacto no se había consumado.([2])

No conforme con la sentencia dictada en apelación por el Tribunal Superior, la parte demandada acudió ante nos mediante petición de *certiorari* para solicitar la revocación de la sentencia recurrida e imputarle a dicho foro haber errado:

A. Al concluir que la parte demandada en este caso había hecho una oferta válida y completa.
B. Al concluir que dicha oferta había sido válidamente aceptada y que el contrato de compraventa se había perfeccionado.
C. Al concluir que la demandante era acreedora a la comisión pactada. Petición de *certiorari*, pág. 7.

Decidimos revisar, y a tales efectos emitimos una resolución mediante la cual expedimos la petición presentada. Habiendo comparecido ambas partes, y estando en posición de resolver, procedemos a así hacerlo.

## II

Atenderemos los tres (3) señalamientos de error en conjunto por encontrarse íntimamente relacionados. El plan-

---

([2]) Solicitada oportunamente la reconsideración del dictamen referido, fue declarada no ha lugar por el foro de instancia.

teamiento medular que fue formulado por la parte peticionaria es a los efectos de que, al no existir una oferta válida y completa, el contrato de compraventa nunca llegó a perfeccionarse, razón por la cual alega que la demandante no podía ser acreedora a la comisión pactada en el contrato de corretaje. Sostiene, además, que según lo estipulado, la comisión sólo sería exigible en la fecha del otorgamiento de la escritura de compraventa, lo cual, a su entender, implicaba que el pago de la comisión estaba sujeto a que el contrato quedara consumado.

Luego de estudiar y analizar minuciosamente los autos del caso, así como la normativa aplicable a los contratos de corretaje, no podemos coincidir, como lo hace la mayoría de este Tribunal, con los planteamientos esgrimidos por la parte peticionaria. Veamos.

El contrato de corretaje ha sido definido como aquel en virtud del cual una de las partes (el corredor o mediador) se compromete a informar a la otra (el comitente) la oportunidad de concluir un negocio jurídico, o servirle de intermediario, a cambio de una remuneración o un premio (la comisión). F. Puig Peña, *Compendio de derecho civil español*, 3ra ed. rev., Madrid, Ed. Pirámide, 1976, Vol. IV, pág. 210; J.A. Puig Brutau, *Fundamentos de Derecho Civil*, 2da ed. rev., Barcelona, Ed. Bosch, 1982, Vol. II-2, pág. 480; J. Castán Tobeñas, *Derecho Civil español, común y foral*, 14ta ed., Madrid, Ed. Reus, 1988, T. IV, pág. 563. En *Torres v. Arbona, Jr.*, 72 D.P.R. 769, 776 (1951), tuvimos la oportunidad de analizar dicha figura contractual, y dada su finalidad la identificamos como una especialidad comprendida en el contrato de mandato.

Posteriormente, en *Dumont v. Inmobiliaria Estado, Inc.*, 113 D.P.R. 406 (1982), abundamos sobre el concepto "contrato de corretaje", y tras recurrir a los pronunciamientos que en torno a dicho tema han realizado los tratadistas españoles, concluimos que éste es de naturaleza sui generis, que no se encuentra expresamente regulado por

nuestro Código Civil. Asimismo, acogimos las expresiones de Castán Tobeñas[3] a los efectos de que dicho contrato se ha de regir, en primera instancia, por las normas establecidas por las partes y, en su defecto, habrán de aplicarse las disposiciones generales relativas a los contratos, los usos y las costumbres y las reglas que le sean afines de aquellos contratos típicos con los que guarda íntima relación, como el mandato.

De otra parte, en cuanto a los efectos o las consecuencias que se derivan de la celebración de un contrato de corretaje, Puig Peña[4] sostiene que "lo característico de la actuación del mediador consiste en que se limita a poner en relación directa o indirecta a los futuros contratantes, *sin participar él personalmente en el contrato*, ni como representante de una de las partes, ni como simple mandatario o comisionista suyo; es decir, queda siempre fuera del contrato resultante de su actividad[; y] ... [q]ue es de esencia al contrato de corretaje la existencia de un *premio o retribución*". (Énfasis en el original.)

De las expresiones vertidas se puede colegir con claridad dos (2) características fundamentales del contrato de corretaje. En primer lugar, y como regla general, la obligación del corredor se limita a buscar y aproximar a las partes que pretenden llevar a cabo un negocio jurídico.[5] Ello de una manera propicia y eficaz, y con el propósito de conseguir la coincidencia de voluntades. Lógicamente, el corredor no se compromete a lograr la conclusión o consumación del contrato previsto, ya que este resultado sólo puede quedar a voluntad de los interesados.

Segundo, como podrá observarse el corredor lleva a cabo

---

[3] J. Castán Tobeñas, *Derecho Civil español, común y foral*, 14ta ed., Madrid, Ed. Reus, 1988, T. IV, pág. 567.

[4] F. Puig Peña, *Compendio de derecho civil español*, 3ra ed. rev., Madrid, Ed. Pirámide, 1976, Vol. IV, pág. 210.

[5] Véase, además, F. Pérez Rivera, *Hacia la identificación del contrato de corretaje de bienes raíces dentro del ordenamiento jurídico puertorriqueño*, 50 Rev. C. Abo. P.R. 43 (1989).

las obligaciones o los servicios a cambio de una retribución o comisión. Es aquí donde nos enfrentamos a la obligación del comitente: abonar al corredor la comisión prevista en el contrato de corretaje. Sobre el concepto "comisión", en *Col. Int'l. Sek P.R., Inc. v. Escribá*, 135 D.P.R. 647, 656 (1994), citamos con aprobación las palabras de Puig Peña antes transcritas, y al amparo de ellas sostuvimos que "[u]no de los elementos esenciales del contrato de corretaje lo es la 'comisión', a pagarse al corredor, la cual ha sido definida en el campo de los bienes raíces como 'la cantidad que se le paga a un corredor de bienes raíces por sus servicios, y que por lo general es un porcentaje del precio de venta' ".

Ahora bien, al examinar la obligación que tiene el comitente de pagar la comisión pactada, hay que determinar cuándo en realidad se debe ésta. Es decir, cuándo es que surge el derecho del corredor a recibir la retribución estipulada en pago por sus servicios. Sobre el particular, en *Col. Int'l. Sek P.R., Inc. v. Escribá*, supra, págs. 656–657, expresamos lo siguiente:

> En el citado caso de *Torres v. Arbona, Jr.*, ante, pág. 778, expresamos, en relación con el derecho que tiene el corredor a cobrar la comisión, que:
> La jurisprudencia americana se pronuncia casi unánimemente en el sentido de que en casos de esta índole *basta que el corredor a quien se ha encomendado la venta de determinada propiedad encuentre un comprador dispuesto, deseoso y en condiciones económicas de comprar (ready, willing and able) para que el corredor tenga derecho a la comisión*, así como en el sentido de que cuando existiere el pacto de que el corredor tendrá derecho a su comisión cuando quede consumado el contrato, el derecho a la comisión subsiste en aquellos casos en que la no consumación se ha debido al fraude, culpa o mala fe del vendedor. Desde luego, si el corredor o presunto comprador tenían conocimiento de los defectos o vicios de que adolecía la cosa el vendedor no es responsable, puesto que entonces no puede imputársele mala fe, culpa o negligencia. (Énfasis suplido y en el original.)
> En el referido caso de *Torres v. Arbona, Jr.*, expresamos, en adición, que cuando el dueño de una finca solicita los servicios de un corredor para que venda una propiedad y éste encuentra

un comprador, queda perfeccionado el contrato de compraventa entre el vendedor y el comprador, y el corredor tiene derecho a su comisión aun cuando no se consumase el contrato por el comprador haberlo rescindido luego.

En relación a este punto, en *Lamboy v. Irizarry*, 73 D.P.R. 331, 333 (1952), este Tribunal resolvió que para que surja el derecho a cobrar comisión por parte de un corredor de negocios, a quien se le encomienda la venta de una propiedad, es necesario "(1) que la venta se hubiera realizado, con la cual el contrato de compraventa hubiera quedado consumado; o (2) que el contrato de compraventa hubiera quedado perfeccionado —aun sin llegarse a consumar la venta— y el mismo se hubiera rescindido voluntariamente ...". (Escolio suprimido.)

La jurisprudencia del Tribunal Supremo de España también ha reiterado la doctrina aludida en cuanto al pago de la comisión por servicios de corretaje. A tales efectos, la Sentencia de 14 de noviembre de 1970 resolvió que el ejercicio de la facultad de rescindir el contrato previsto "carece de trascendencia respecto al mandatario o mediador, quien *cumplida su obligación de gestionar el contrato, queda el mandante u oferente obligado a satisfacer la retribución que le corresponde* [al corredor], sin que el incumplimiento o apartamento voluntario de la consumación de aquel contrato le exima de tal obligación". (Énfasis suplido.) S. de 14 de noviembre de 1970, Núm. 4798, XXXVII (Vol. II) Repertorio de Jurisprudencia 3267, 3268. Sostuvo, además, que "entender lo contrario equivaldría a dejar al arbitrio del mandante u oferente el cumplimiento de la obligación de retribuir al mandatario". Íd. La Sentencia de 5 de julio de 1946, Núm. 934, XIII Repertorio de Jurisprudencia 617, declaró asimismo que el corredor no tiene derecho a cobrar su comisión mientras el contrato no se perfeccione, pero una vez perfeccionado por su mediación, la rescisión por causas ajenas al corredor no puede afectar su derecho a percibir la retribución que le corresponde.

A tenor con todo lo expresado debemos concluir que, como regla general, aun en los casos en los que el contrato con respecto al cual estuvo dirigida la actividad del corredor no quede consumado, lo esencial al momento de deter-

minar si el corredor es acreedor a la comisión pactada es establecer si dicho contrato llegó a perfeccionarse por gestiones de éste. Claro está, ello en ausencia de un convenio entre las partes que establezca en específico cuándo y bajo qué circunstancias surgirá el derecho del corredor a cobrar dicha remuneración. Una vez establecido que el contrato previsto llegó a perfeccionarse, procederá entonces determinar a qué se debió su no consumación.

## III

Tomando en consideración la normativa antes expuesta, pasemos a analizar los hechos del caso que nos ocupa.[6] De éstos se desprende que las partes otorgaron un contrato de corretaje mediante el cual la corredora se comprometía únicamente a encontrar un posible comprador que estuviera dispuesto a pagar por el inmueble el precio de venta estipulado. Es decir, a través del contrato de corretaje la corredora quedó autorizada por el vendedor a *ofrecer* la propiedad a posibles compradores. Es incuestionable que la corredora no se comprometió a procurar la consumación del contrato de compraventa. Como indicáramos antes, la consumación o conclusión de dicho contrato sólo podía quedar a voluntad del vendedor y el comprador.

Por otro lado, de un examen de las cláusulas del contrato de corretaje tampoco puede estimarse que las partes hubiesen tenido un acuerdo especial que presuponía la formalización de un contrato de compraventa, y no meramente su concertación, como requisito para que surgiera el derecho a cobrar la comisión pactada. La estipulación con respecto a que la comisión sería pagadera a la fecha del

---

[6] Adviértase que, habiéndose resuelto el caso de autos a base de prueba documental por tratarse de una sentencia sumaria, este Tribunal se encuentra en la misma posición que el foro de instancia en relación con las determinaciones de hecho apreciación y evaluación de la prueba referida. *Ramírez, Segal & Látimer v. Rojo Rigual*, 123 D.P.R. 161 (1989); *Asoc. Auténtica Empl. v. Municipio de Bayamón*, 111 D.P.R. 527 (1981); *P.P.D. v. Admor. Gen. de Elecciones*, 111 D.P.R. 199 (1981).

otorgamiento de la escritura de compraventa sólo establecía el *momento* cuando la corredora recibiría el pago de su comisión en caso de llegar a consumarse el contrato, y no el hecho o acontecimiento que determinaría su derecho a ser indemnizada por sus servicios.

Procede determinar, entonces, si el contrato de compraventa llegó a perfeccionarse. Sobre el particular hemos sostenido que la aceptación de una oferta es el procedimiento mediante el cual se perfecciona un contrato. Pero para que ello sea así, es necesario que dicha oferta reúna ciertos requisitos, entre los que se destaca el que ésta sea completa y que contenga todos los elementos esenciales del negocio que se pretende realizar, de manera que por la mera aceptación de la oferta pueda surgir el contrato. *Prods. Tommy Muñiz v. COPAN*, 113 D.P.R. 517 (1982).

En el caso de autos, el contrato denominado *Contract of Sale* contenía la oferta hecha por el vendedor a través de la corredora. Esta oferta incluía una relación del mobiliario con que contaba el inmueble, el estado en que éstos se encontraban, la existencia de una hipoteca, *el precio de venta que había autorizado el vendedor en el contrato de corretaje*, y la manera en que sería pagada dicha suma. En vista de ello resulta ineludible concluir que la oferta hecha por el vendedor era completa.([7])

Así las cosas, la oferta fue aceptada por el comprador mediante la firma del referido contrato (*Contract of Sale*), y

---

([7]) Sostiene la parte peticionaria que el señor Daubón había firmado el contrato de corretaje en su carácter personal, y que siendo el inmueble de carácter ganancial, la oferta no podía considerarse como válida y completa sin la firma de ambos cónyuges. Sostiene su contención en que según nuestro ordenamiento civil resulta indispensable la concurrencia del consentimiento de ambos cónyuges para enajenar bienes de la sociedad legal de gananciales. Tal argumento carece totalmente de méritos.

Adviértase que, como parte de las alegaciones de la demanda, la parte demandante indicó "[q]ue aunque [en] las representaciones que el demandado hiciera a la demandante él era el único dueño de la referida propiedad, en sus relaciones con la demandante actuaba por sí y en representación de su esposa la Sra. Daubón y la sociedad legal de gananciales que tiene constituida con ésta". Apéndice, pág. 43. Dicha alegación fue admitida por la parte demandada en su contestación a la demanda.

ello le fue notificado posteriormente al vendedor. De esta manera la corredora cumplió con las gestiones que le habían sido encomendadas en virtud del contrato de corretaje, y se perfeccionó a su vez el contrato de compraventa.[8]

Sólo resta precisar a quién se debió la no consumación del contrato. En torno a este aspecto, coincidimos con las expresiones vertidas por el foro recurrido a los efectos de que la causa principal para la no consumación fue el retiro que hizo el vendedor de la oferta original, ya que el contrato de corretaje no le daba facultad para cambiar el precio o las condiciones de venta en cualquier momento. Efectivamente, la frase "or at any other price and terms which I may agree" debe interpretarse en el sentido lógico de que si la corredora conseguía un comprador que estuviera dispuesto a comprar la propiedad por un precio menor al fijado, o por condiciones más onerosas al vendedor, entonces la corredora tenía que consultar tales circunstancias con éste último a los fines de lograr su aceptación o rechazo.

Más aún, le asiste la razón a dicho foro al sostener que, en vista de que las partes estipularon que el contrato era abierto, o de duración no determinada, el vendedor tenía derecho a cambiar el precio o las condiciones de la oferta, e incluso a retirarla por completo. *Pero ello tenía que haberlo hecho antes de que un comprador dispuesto y deseoso aceptara la oferta presentada originalmente, evitando así el posible perfeccionamiento de un contrato.*

## IV

En síntesis, habiéndose obligado el demandado Sr. Horacio Daubón, por sí y en representación de la sociedad legal de gananciales que compone con su esposa, la señora

---

[8] Véase el Art. 1215 del Código Civil, 31 L.P.R.A. sec. 3401.

Daubón, a pagar a la corredora una comisión por los servicios dispuestos en el contrato de corretaje; habiendo la corredora llevado a cabo sus servicios gestionando el perfeccionamiento del contrato de compraventa mediante la aceptación de una oferta válida y completa por el comprador, y no habiéndose consumado el contrato previsto debido a las actuaciones del vendedor, forzoso nos resulta concluir que, en ausencia de pacto en contrario, la corredora recurrida tiene derecho a que éstos le satisfagan el monto de sus servicios según éste fue pactado en el contrato de corretaje.

Por todos los fundamentos antes expuestos, disentimos y confirmaríamos la sentencia recurrida.