Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VIII

| JACQUELINE E. HERNÁNDEZ SANTIAGO | | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Caguas |
|---|---|---|
| Apelada | | |
| V. | TA2025AP00434 | Caso Núm.: SJ2021CV06386 |
| ROSA RODRÍGUEZ VÉLEZ, ET ALS | | Sobre: Cobro de Dinero- Ordinario |
| Apelante | | |

Panel integrado por su presidenta; la Juez Lebrón Nieves, el Juez Pagán Ocasio y la Jueza Álvarez Esnard

*Lebrón Nieves, Juez Ponente*

## SENTENCIA

En San Juan, Puerto Rico, a 13 de febrero de 2026.

El 10 de octubre de 2025, compareció ante este Tribunal de Apelaciones, la señora Rosa Rodríguez Vélez, el señor Héctor A. Martínez Torres y otros (en adelante, parte apelante), mediante recurso de *Apelación*. Por medio de este, nos solicita que revisemos la *Sentencia* emitida el 7 de agosto de 2025 y notificada el 9 de agosto de 2025, por el Tribunal de Primera Instancia, Sala Superior de Caguas. En virtud del aludido dictamen, el foro *a quo* declaró Ha Lugar la *Demanda* de cobro de dinero, modificó la facturación por hora a $200.00 y dictó *Sentencia* condenando a la parte apelada a satisfacer a favor de la licenciada Jacqueline E. Hernández Santiago (en adelante, parte apelada o licenciada Hernández Santiago), la suma de $50,040.00 en concepto de servicios prestados, más el interés legal sobre dicha cuantía hasta la completa satisfacción de dicho dictamen.

Por los fundamentos que adelante se exponen, se confirma la *Sentencia* apelada.

**I**

El caso que nos ocupa tiene su génesis en una *Demanda* sobre cobro de dinero interpuesta el 30 de septiembre de 2021 por la licenciada Hernández Santiago en contra de Rosa Rodríguez Vélez, Héctor A. Martínez Torres, Caribbean Dental Clinic, PSC, Roshec, Corp. y Complete Internal Medicine. En apretada síntesis, en la aludida *Demanda* se alegó que la parte apelante le adeudaba a la parte apelada la suma de $62,500.00 en concepto de honorarios de abogados. Particularmente, se aseveró que, la parte apelante contrató los servicios de la parte apelada para la posible radicación de varios pleitos de quiebras o, en la alternativa, llevar a cabo la negociación de las deudas contraídas por la parte apelante con su acreedor, el Banco Popular de Puerto Rico. Al respecto, se alegó que, el Banco Popular de Puerto Rico (BPPR) obtuvo a su favor, dos sentencias en unos casos sobre ejecución de hipoteca interpuestos en contra de la parte apelante. Conforme a lo alegado, ambas deudas, estaban garantizadas tanto con el inmueble como con garantías personales de la parte apelante.  La parte apelada alegó que, a pesar de que sus gestiones profesionales habían resultado exitosas, a la fecha de la presentación de la *Demanda* en cuestión, la parte apelante no le había satisfecho sus honorarios. La aludida *Demanda* fue enmendada en dos ocasiones, a saber, el 5 de octubre de 2021 y, posteriormente, el 27 de octubre del mismo año.

El 9 de enero de 2022, la parte apelante presentó su alegación responsiva, la cual fue enmendada el 10 de enero de 2022. En esta, aceptó que los apelantes, la doctora Rodríguez Vélez y el doctor Martínez Torres, contrataron con la licenciada Hernández Santiago, más no así, las corporaciones. Los apelantes reconocieron no haberle pagado a la parte apelada por los servicios prestados. Alegaron afirmativamente que las facturas habían sido objetadas y negaron las restantes alegaciones.

Acaecidas varias incidencias procesales innecesarias pormenorizar, el 7 de diciembre de 2023, la parte apelada instó ante el foro primario *Moción de Sentencia Sumaria*.

En respuesta, el 20 de febrero de 2024, la parte apelante presentó *Contestación a la Moción de Sentencia Sumaria – Regla 36.3 (b)*.

Atendidos los respectivos escritos de las partes, el 1 de abril de 2024, notificada al día siguiente, la primera instancia judicial emitió *Resolución* mediante la cual declaró No Ha Lugar la *Moción de Sentencia Sumaria* de la parte apelada y ordenó a las partes culminar el descubrimiento de prueba para el 31 de mayo de 2024. Asimismo, pautó la Conferencia con Antelación a Juicio y Vista Transaccional para el 19 de agosto de 2024, a las 2:00pm, mediante videoconferencia.

En la *Resolución* antes mencionada, el foro primario esbozó los siguientes hechos que no están en controversia y los hechos en controversia:

**HECHOS QUE NO ESTÁN EN CONTROVERSIA**

1. La Demandante es abogada con 34 años de experiencia en Quiebras y Manejo de reclamaciones de deudas y cobros de dinero.

2. Ejerce como abogada de quiebras desde el año 1989.

3. La Dra. Rosa Rodríguez fue a la oficina referida por un amigo común.

4. Debido a que tenían todas sus cuentas en el banco acreedor (Banco Popular) ésta los asesoró de que debían mover sus cuentas a otro banco porque estaban expuestos a que el banco les cobrara con sus ahorros y de los ingresos y pagos de los planes médicos. Esto hicieron y se movieron al First Bank por recomendación legal de la Demandante.

5. Solicitó muchos documentos para preparase y observó una de las sentencias se habían allanado a todo a pesar de que la hipoteca no se había inscrito y existían defensas disponibles a favor de los Dres. Rodríguez y Martínez.

6. Era necesario pedir reconsideración urgente para tener tiempo para poder negociar.

7. Al banco denegar, regresan con más urgencia y empiezan a trabajar toda la situación.

8. Como el banco conoce que la Lcda. Hernández es abogada dedicada a Quiebras ésta le dice al banco que no se mueva porque si radica quiebra le tiene que liberar las garantías.

9. Que luego de un trámite de casi un año se logró venta de la propiedad de Palmas del Mar en un short sale por una fracción de lo adeudado y que la cantidad economizada no tuvieran que tributarla como un ingreso. La oficina de HIMA se logró retener gracias a la gestión de la Demandante.

10. Se logró vender la propiedad de Palmas del Mar a través de un realtor recomendado por la Demandante y se logró que el Banco aceptara un short sale donde la deficiencia no tributara y solamente tuvieran que pagar una cantidad mínima. Además, conservaron la propiedad de HIMA, oficina médica del Dr. Martínez donde también se ahorraron una gran cantidad de dinero, no tuvieron que pagar contribuciones por deficiencia, se devolvieron todas las garantías personales y corporativas, economizándose grandes sumas de dinero.

11. Hacía el caso más difícil para negociar, el hecho de que los Doctores tenían un millón de dólares en ingresos y era más difícil justificar ofertas por debajo de lo adeudado cuando tenían sentencias por altas sumas de dinero, pero al mismo tiempo tenían unos ingresos altos[.]

12. La Demandante envió una factura por sus servicios y se negaron a pagarla.

13. Termina el caso y como no le pagaban envía un recordatorio indicando que no le han pagado.

14. Luego llega una carta del Lcdo. Rosado indicando que estará representando a los Demandados con relación a la factura.

15. Lcdo. Rosado le solicita factura detallada para discutirla con los Doctores para pagar o hacer oferta.

16. Luego trata de comunicarse en múltiples ocasiones con el Lcdo. Rosado (RIP) y no lo consigue hasta que éste le indica que está enfermo y que otro abogado lo sustituirá.

17. El Lcdo. Rosado fallece sin ninguna oferta de pago y luego de su fallecimiento la Demandante recibe una Queja ética radicada por los Codemandados

sin hacer ninguna oferta ni tratar de llegar a un acuerdo.

18. La Demandante siguió tramitando el caso negociando el acuerdo final y la Demandada le solicita a la Demandante estuviera con ellos en la firma del acuerdo porque ella había negociado el acuerdo. Incluso, le dijo que sólo firmaría si la Demandante estaba allí representándolos. La Demandante accedió y estuvo presente en la firma estando presente hasta el último momento.

19. Por sus años de experiencia [en] el Tribunal Federal, la Demandante cobra $250 la hora y así lo ha autorizado el Tribunal Federal en 240 casos del 2015 al 2022. De hecho, no tiene otr[a] tarifa por hora y actualmente el Tribunal le autoriza a razón de $275 la hora.

20. La codemandada, Dra. Rosa M. Rodríguez Vélez, es Dentista de profesión desde 1990 y también aplica Botox desde el 2010 con oficina privada desde el 2009.

21. El codemandado (Héctor Martínez) es Doctor en Medicina Interna desde hace 41 años y director del Departamento de Medicina Interna del Hospital HIMA. Tiene práctica privada en la oficina HIMA 306.

22. El Dr. Martínez tiene oficina en HIMA 306, Plaza I # 100, Ave. Luis Muñoz Marín, Caguas PR 00725.

23. Cuando fue a entrevista inicial con la Demandante, Lcda. Hernández, sabían que ésta era Abogada en la práctica privada de Quiebras y nunca habían contratado a una abogada de Quiebras.

24. Allá para los años 2016 al 2019 tenían reclamos del Banco Popular debido a atrasos en los pagos. Específicamente, las deudas en controversia gravaban la oficina del Dr. Martínez en HIMA 306 de Caguas y el apartamento en Maralago ubicado en Palmas del Mar en Humacao.

25. Los Demandados contratan a la Demandante para que los represente en Quiebra y en su defecto en las negociaciones con el Banco Popular.

26. En la Réplica a Contestación de Queja ética los Demandados admiten que estuvieron bien representados: "A fin de cuentas reconocemos la labor realizada por la Lcda. Hernández y reconocemos que debe ser compensada razonablemente".

27. En la misma Réplica a Queja ética admite que los honorarios facturados a razón de $250 la hora están dentro del valor en el mercado en caso de Quiebra. Específicamente indicó: "Es correcto que la Lcda. Hernández manifestó que sus honorarios

para un caso bajo Capítulo 11 de Quiebras era $250. Reconocemos que eso está dentro del valor en el mercado para los servicios legales relacionados a procedimientos que surgen del Capítulo 11 del Código de Quiebra.

28. A pesar de que los Demandados dicen no estar de acuerdo con honorarios facturados, ni con la factura ajustada (reduciendo sustancialmente los honorarios facturados), no le solicitó la renuncia y ésta continuó representándolos.

29. No le pidió la renuncia a pesar de que había cuestionado los honorarios y tampoco había pagado nada.

30. Cuando recibe la factura con la que no estaba de acuerdo, no le pide la renuncia y de hecho no le pide renuncia en ningún momento.

31. Los Demandados admitieron que la Lcda. Hernández continuó representándolos bajo el entendido de que eventualmente le iban a pagar sus honorarios.

32. Los Demandados admiten que la Demandante realizó la labor por la que fue contratada: "Entendemos que cada vez que compareció a una reunión a nombre de nosotros estuvo llevando a cabo la labor por la cual fue contratada".

33. Los Demandados admitieron que la Lcda. Hernández tuvo que dedicar tiempo a familiarizarse con nuestro caso y a prepararse para las reuniones: "También somos conscientes de que la Lcda. Hernández tuvo que dedicarle tiempo a familiarizarse con nuestro caso y a prepararse para nuestro caso".

34. Ello porque tenía que familiarizarse con planillas, estados financieros, información de cuentas, activos por si tenía que radicar quiebra. Tenía que conocer estados de situación financiera del esposo, ella y las corporaciones.

35. Los codemandados contrataron al Lcdo. Resto para representarlos en la demanda del banco contra ellos por los atrasos de la Oficina HIMA 306 y se allanó a que dictaran sentencia, aunque la hipoteca no estaba inscrita. Además, le pagaron sus honorarios.

36. La codemandada, Dra. Rodríguez, iba con frecuencia a la oficina de la Lcda. Hernández por razón del trámite del caso. La Demandada aceptó que fue alrededor de 20 a 25 ocasiones a la oficina de la Demandante.

37. La Doctora llamaba con frecuencia y recibía llamadas frecuentes de la Lcda. Hernández relacionadas con el caso.

38. Hubo muchos emails en el caso y la Lcda. Hernández le copiaba los emails del Banco.

39. La Lcda. Hernández tenía que comunicarse con el Lcdo. Resto y Lcdo. Martínez, contable y corredor de bienes raíces.

40. Llegaron a la oficina de la Demandante con dos sentencias en contra y a punto de advenir final y firme.

41. Los Demandados habían dado garantías personales ilimitadas y lo mismo aplicaba a las corporaciones codemandadas sobre propiedad de HIMA 306 (oficina del Dr. Martínez). Rochec era dueño de la Oficina HIMA 306.

42. Si el banco ejercía esas garantías ilimitadas se afectaban la Dra. Rodríguez, el Dr. Martínez y sus corporaciones.

43. El préstamo alegadamente hipotecario sobre HIMA 306 era préstamo personal.

44. Por lo anterior, la Demandante le dijo a los Demandados que si radicaba quiebra tenía que radicar a nombre de las corporaciones y de los Dres.

45. Antes de contratar a la Demandante trataron de negociar esas deudas sin éxito alguno.

46. Anterior a la Demandante contrataron a un contable de Legal Advisor para que los ayudara con deudas de ellos y de la corporación. Y resultó que el grupo nunca existió. Alexis Rivera y Manolo Vargas los contratan para Loss Mitigation y ninguno dio el servicio por el cual pagaron porque eran fraudulentos. Incluyendo que Manolo Vargas tenía historial criminal y le cobraron dinero y no dieron servicio. A Manolo Vargas le pagaron $3,000 para negociar con Banco y lograr un Short Sale sin ningún resultado. Eso no fue culpa de la Demandante porque ocurrió antes de que la contrataran.

47. Estaban bregando con la situación desde el 2016 y no es hasta que llegan a la oficina de la Lcda. Hernández que ésta resuelve la situación.

48. Los abogados Resto y Surillo tenían los casos de Mara Lago y de HIMA 306 y se dictó sentencia contra los Demandados y nunca le sugirieron que buscaran abogado de Quiebras. Los Demandados no resolvieron los problemas de las reclamaciones del banco hasta que llegaron a la oficina de la Demandante.

49. La Demandante fue la que los asesoró para que movieran las cuentas del Banco Popular (acreedor

de las dos sentencias dictadas contra los demandados) porque tenían todos sus ahorros e ingresos en el mismo Banco acreedor y siguiendo el consejo legal de la Demandante movieron sus cuentas al First Bank.

50. Los Demandados llegaron a un acuerdo antes de contratar a la Demandante a favor de Manuel Vargas, quien no era abogado, donde le cobró $3,000 y unos % de lo que le economizaran más el pago de los gastos.

51. Los Demandados admiten que durante el trámite del caso no le pagaron a la Demandante en ningún momento.

52. La oficina fue comprada por una corporación de los Demandados con dinero de los Demandados por una cantidad mucho menor a lo que exigía el banco porque la Demandante los asesoró que el banco aceptaría una oferta mucho menor de un tercero. Ello debido a la hostilidad del Banco hacia ello.

53. Dinero para pagar la compra de la Oficina HIMA lo pusieron ellos. Compraron por $190,000 aproximadamente, pero la deuda por sentencia era mucho mayor.

54. Cuando recibe la primera factura de la Demandante ya ésta había hecho gran parte del trabajo y a pesar de que alega no estar de acuerdo con la factura, no le solicita la renuncia.

55. En la reunión de agosto de 2019 ya la Demandante les había hecho una rebaja de honorarios y el ajuste tenía el efecto de una rebaja.

56. En email del 8 de julio de 2019 dirigido a la Lcda. Hernández se dio un plazo final para presentar la información financiera de cada corporación y que ya había bajado sentencia del Apelativo. La Demandante le pasó el mensaje de que tenían fecha para proveer planilla porque iba a tener que radicar quiebra y debían reunirse. Le explicó que se tendrían que radicar 5 quiebras.

57. La Sentencia dictada contra los Demandados en el caso HSCI 2016- 01081 se dictó por las sumas de $637,000 y ordenó una primera subasta por dicha cantidad.

58. No había proceso de mitigación porque era un préstamo comercial.

59. El abogado de los demandados en el pleito HIMA 306 aceptó deuda y se allanaron a que se dictara sentencia.

60. Los Demandados ofrecieron $350,000 por esa propiedad y el banco denegó. Terminaron pagando sólo $190,000 gracias al trabajo de la Demandante.

61. La representación de la Lcda. Hernández logró que se negociara y devolvieran las garantías personales de las corporaciones y los doctores. El asesoramiento sobre que se podía negociar la devolución de las garantías personales se lo dio la Demandante.

62. La Demandante tuvo que solicitar documentos, verificar cuentas y estados financieros para determinar cuáles eran los riesgos legales, analizar si radicaba quiebra o ganaban tiempo para negociar y para poder tramitar el caso.

63. Surge de los emails que la Lcda. Hernández es la persona que está representándolos, era la persona que determinaba las estrategias y se encargaría de las negociaciones. La Lcda. Hernández es la persona que está dirigiendo todo el proceso de negociaciones y se comunica con el Banco en representación de los Demandados. Los emails reflejan que la Lcda. Hernández estaba al tanto de lo que ocurría en los Tribunales Estatales y dirigía las estrategias a seguir para negociaciones.

64. Tramitación del caso requería que se reuniera con abogada del banco, la Lcda. Rickenback.

65. Préstamo de la propiedad HIMA 306 es comercial y los abogados contratados antes de la Lcda. Hernández no le habían dicho que a los préstamos comerciales no les aplicaba Loss Mitigation.

66. Maralago no era residencia principal e igual no le aplicaba Loss Mitigation a pesar de que los Demandados alegaban habían llenado documentos solicitando mitigación.

67. La Lcda. Hernández recomendó a Fernando Rodríguez como realtor, y a Martha Davison, se tenía que comunicar con el Lcdo. Resto, tenía que comunicarse con la Lcdo. Rickenbach del Banco Popular, recomendó para escritura a la Lcda. Wanda Luna, tenía que comunicarse con la Lcda. Luna para coordinar, tenía que comunicarse con contable y con el Lcdo. Gaspar Martínez. Además, tenía que comunicarse con el Dr. Martínez, con el Departamento Comercial del Banco Popular, con Martha Davison y Fernando.

68. Las llamadas entre la Lcda. Hernández y la Dra. Rodríguez originaron durante el trámite del caso alrededor de 141 llamadas.

69. Hubo muchos emails y todos requerían trámite de la Lcda. Hernández y ésta le notificaba a la Doctora de todos los emails que llegaban.

70. Además, le informaba de las reuniones con otras personas y la Demandada estuvo en algunas de ellas.

71. En el email del 15 de agosto de 2019 la Lcda. Rickenbach le notifica oferta revisada a la Lcda. Hernández que deben firmar acuerdos negociados antes del 20 de agosto de 2019 y la Lcda. Hernández instruye a los Demandados sobre cómo aceptar oferta y proceso de firma luego de asesorarlos en el proceso de short sale.

72. Para el 15 de agosto de 2019 la Demandante le había enviado factura de honorarios y no la habían pagado, pero aun así continúo representándolos hasta el final del caso, aunque no le habían pagado.

73. La demandada admitió que la Demandante continuó representándolos bajo el entendido de que eventualmente ustedes le iban a pagar.

74. El 28 de agosto de 2019 la Lcda. Hernández gestiona con sus clientes las resoluciones corporativas necesarias para la firma del acuerdo y las envía al banco.

75. En el email del 28 de agosto de 2019 se ultima detalles de fecha para la firma final del acuerdo entre demandado y para la revisión de los acuerdos por parte de la Lcda. Hernández, además le solicita las resoluciones corporativas.

76. El caso comenzó el 25 de septiembre de 2018 y terminó el 28 de agosto de 2019, salvo por las garantías que fueron entregadas luego del término de 91 días establecido.

77. Aun sin haberle pagado ni un centavo, la Dra. Rodríguez le pide a la Lcda. Hernández que la acompañe al Banco para la firma del acuerdo final que había sido negociado por la Demandante. Incluso, le indicó que no firmaría el acuerdo si ella no estaba presente para asegurar que el Banco incluyera lo que se negoció. La Lcda. Hernández accedió a acompañarla y continuó representándolos hasta el final a pesar de que en ese momento no había recibido ninguna paga por su trabajo. Aun así, los acompañó a firma.

78. Proceso terminó el 29 de agosto de 2019 y se dejó pendiente devolver las garantías personales por 91 días porque la Lcda. Hernández había indicado que podían radicar quiebra en caso de que no cumplieran y ese era el término donde banco tenía que devolver lo ejecutado si por alguna razón se dejaba acuerdo sin efecto.

79. La factura detallada y la ajustada con rebaja sustancial nunca fueron pagadas y cuando la Demandante intentó cobrar sus honorarios, los Demandados le radicaron una Queja Ética que el Hon. Tribunal Supremo archivó según recomendación.

Asimismo, el foro primario consignó los siguientes:

**HECHOS EN CONTROVERSIA**

1. Si la cantidad de horas trabajas concuerda con las facturadas.

2. La tarifa hora o precio global por el que la Demandante fue contratada.

En vista de lo anterior, declaró No Ha Lugar la solicitud de sentencia sumaria en cuestión.

Acaecidas varias incidencias procesales innecesarias pormenorizar, el Juicio en su Fondo se llevó a cabo el día 22 de julio de 2025. Subsiguientemente, el 7 de agosto de 2025, el foro apelado emitió la *Sentencia* apelada, en la que consignó las siguientes determinaciones de hechos:

1. La Lcda. Hernández, además, de tener sobre 34 años de experiencia en la presentación de peticiones de quiebra, tiene un vasto conocimiento sobre la negoción de deudas con instituciones financieras. Así, evitando que sus clientes tuviesen que acogerse a la Ley de Quiebra.

2. La práctica de quiebra y negociación de deudas es muy compleja, ya que la revisión de múltiples documentos y data financiera del cliente, incluyendo, pero no limitándose a planillas de los últimos 4 años, estados financieros, estados bancarios, presupuesto de ingresos y gastos, deudas adicionales, deudas con entidades gubernamentales, y toda información que pueda incidir en la petición de quiebra.

3. La negociación de deuda sin la presentación de una petición de quiebra es más exigente y requiere más dedicación debido a que el acreedor puede ejecutarle las garantías al cliente. Ello así, por no existir un Stay Order emitido por una corte.

4. La Dra. Rodríguez visitó las oficinas de la Lcda. Hernández para el 25 de septiembre de 2018, interesada en someter 5 peticiones de quiebras, todas Capítulo 11, debido a que el acreedor, BPPR, había obtenido a su favor 2 sentencias de ejecuciones de hipoteca en contra de la parte demandada y dichos dictámenes estaban por advenir finales, firmes e inapelables. Las deudas contenían garantías inmuebles (propiedad Maralago en Palmas del Mar, Humacao y la Oficina #306 en la Torre de HIMA, al igual de garantías personales y corporativas de los codemandados.

5. Iban a ser 5 peticiones de quiebra, una por cada codemandado.

6. En esa primera reunión, la Lcda. Hernández le informó a la Dra. Rodríguez que requería un pronto de $10,000.00 por cada petición de quiebra a presentarse, lo que equivalía a $50,000.00. Conociendo los honorarios, la Dra. Rodríguez optó por autorizar al Lcdo. Resto a subir la oferta de transacción cursada al BPPR en cuanto a la Oficina #306 en la Torre HIMA, de $300,000.00 a $350,000.00.

7. Dicha oferta fue denegada por BPPR, lo cual motivó que la Dra. Rodríguez consultara, nuevamente, a la Lcda. Hernández.

8. Los funcionarios de BPPR no tenían la mejor actitud durante las negociaciones, ya que llevaban desde el 2016 sin haber logrado acuerdo de pago alguno más contaban con 2 sentencias a su favor, pudiendo ejecutar todas las garantías.

9. La parte demandante, Lcda. Hernández, prestó servicios a la parte demandada desde el 25 de septiembre de 2018 hasta el 28 de agosto de 2019 más 90 días adicionales esperando por la entrega de las garantías personales.

10. Las facturas de la Lcda. Hernández eran a razón de $250.00 por hora. Actualmente, el Tribunal Federal le permite facturar a razón de $275.00 la hora.

11. El 19 de febrero de 2019 la Lcda. Hernández le cursó la primera factura a la parte demandada. El 19 de agosto de 2019 la Lcda. Hernández le cursó al Lcdo. Rosado, abogado de la parte demandada y a solicitud de este, una factura detallada por la cuantía de $62,656.85 en concepto de honorarios de abogados por 250.20 horas trabajadas.

12. El método de facturación utilizado por la parte demandante es el Lodestar (Lodestar Method) que es el que se usa en el Tribunal Federal a la hora de solicitar honorarios.

13. Entre la Lcda. Hernández y la Dra. Rodríguez hubo más de 140 llamadas telefónicas.

14. La parte demandada se ahorró más de $700,000.00 debido a las gestiones de la Lcda. Hernández y sin tener que presentar peticiones de quiebra. Además, la parte demandada no tuvo que tributar sobre el balance no pagado.

15. La parte demandada conservó la Oficina #306 de la Torre HIMA y la propiedad de Maralago ubicada en Palmas del Mar Humacao se vendió en un short sale, estos teniendo que satisfacer, únicamente, $15,000.00. Ello a pesar, de que las sentencias

sobre ejecución de hipotecas de ambos inmuebles ascendían a más de $700,000.00. Por la referida oficina la parte demandada satisfizo la suma de $190,000.00 aproximadamente. En total la parte demandada tuvo que desembolsar $205,000.00 aproximadamente y todas las garantías personales le fueron devueltas.

16. La Lcda. Hernández siempre tuvo la expectativa que la parte demandada le pagaría el dinero adeudado en conceptos de honorarios de abogado.

17. La parte demandada estuvo satisfecha con la representación legal de la parte demandante, Lcda. Hernández.

18. La queja ética presentada contra la Lcda. Hernández fue archivada por el Tribunal Supremo.

19. La Dra. Rodr[í]guez admitió que antes de presentar una queja ética contra la Lcda. Hernández, previamente había sometido otra queja contra otra abogada.

20. Por otro lado, cuando la parte demandada recibe la primera factura por honorarios para febrero de 2019 a razón de $250.00 la hora no le piden la renuncia. Las partes se reunieron con el amigo en común para lograr algún entendido entre estos. La parte demandada nunca le pidió la renuencia a la Lcda. Hernández.

Consecuentemente, el foro *a quo*, declaró Ha Lugar la *Demanda* de cobro de dinero, modificó la facturación por hora a $200.00 y condenó a la parte apelante a satisfacerle a la parte apelada, la suma de $50,040.00 en concepto de servicios prestados más el interés legal sobre dicha cuantía hasta la completa satisfacción del aludido dictamen.

En desacuerdo, el 25 de agosto de 2025, la parte apelante presentó *Moción de Reconsideración*. Mediante *Orden* emitida el 10 de septiembre de 2025, la primera instancia judicial declaró No Ha Lugar la aludida *Moción de Reconsideración*.

Aún inconforme, la parte apelante presentó el recurso cuya revisión nos atiene y esgrimió los siguientes señalamientos de error:

**Primer Error**: El Honorable Tribunal de Primera Instancia incurrió en error, prejuicio y parcialidad al determinar que la Demandante/Apelada trabajó 250 horas y al conferir una presunción de corrección a la

factura de la Apelada, relevándola de su peso de la prueba.

**Segundo Error**: El Honorable Tribunal erró al permitir a la Apelada enmendar las alegaciones para traer una nueva teoría ("lodestar") para justificar la factura inflada.

**Tercer Error**: El Honorable Tribunal cometió error de derecho en su aplicación de "lodestar" al presente caso.

El 7 de enero de 2026, la parte apelada presentó ante este foro revisor, *Alegato de la Parte Apelada.*

Con el beneficio de la comparecencia de las partes, procedemos a disponer del recurso ante nuestra consideración.

## II

### A. *Deferencia al Tribunal de Primera Instancia*

Según es sabido, las determinaciones de hechos y de credibilidad del tribunal sentenciador deben ser merecedoras de gran deferencia por parte de los foros apelativos, puesto que, el juzgador de instancia es quien –de ordinario– se encuentra en mejor posición para aquilatar la prueba testifical. *Peña Rivera v. Pacheco Caraballo*, 213 DPR 1009, 1025 (2024), citando a *Ortiz Ortiz v. Medtronic*, 209 DPR 759, 779 (2022); *Pueblo v. Hernández Doble*, 210 DPR 850, 864 (2022); *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194, 219 (2021). Bajo este supuesto, los foros de primera instancia tienen la oportunidad de oír, ver y apreciar el comportamiento de los testigos. *Peña Rivera v. Pacheco Caraballo*, supra, citando a *Ortiz Ortiz v. Medtronic*, supra; *Pueblo v. Hernández Doble*, supra.

No obstante, la deferencia judicial no es absoluta, pues podrá ser preterida en ciertas instancias. Nuestro Máximo Foro ha reiterado que, los tribunales apelativos no debemos intervenir con las determinaciones ni las adjudicaciones de los juzgadores de primera instancia, salvo que medie pasión, prejuicio, parcialidad o error manifiesto. *Peña Rivera v. Pacheco Caraballo*, supra, pág.

1024, citando a *Ortiz Ortiz v. Medtronic,* supra, pág. 778; *Pueblo v. Hernández Doble*, supra; *Santiago Ortiz v. Real Legacy et al.*, supra.

Como sabemos, "[l]a tarea de determinar cuándo un tribunal ha abusado de su discreción no es una fácil. Sin embargo, no tenemos duda de que el adecuado ejercicio de discreción judicial está estrechamente relacionado con el concepto de razonabilidad." *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 434-435 (2013), citando a *Rivera y otros v. Bco. Popular*, 152 DPR 140, 155 (2000). Es por lo que, nuestra más Alta Curia ha definido la *discreción* como "una forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justiciera." *BPPR v. SLG Gómez-López*, 213 DPR 314, 335 (2023); *Rivera et al. v. Arcos Dorados et al.*, 212 DPR 194, 210 (2023). *Pueblo v. Rivera Montalvo*, 205 DPR 352, 373 (2020), citando a *Citibank et al. v. ACBI et al.*, 200 DPR 724, 735 (2018). Así, la discreción se "nutr[e] de un juicio racional apoyado en la razonabilidad y fundamentado en un sentido llano de justicia; no es función al antojo o voluntad de uno, sin tasa ni limitación alguna." *Citibank et al. v. ACBI et al.*, supra, citando a *SLG Zapata-Rivera v. J.F. Montalvo*, supra, pág. 435; *Hietel v. PRTC*, 182 DPR 451, 459 (2011); *Santa Aponte v. Srio. del Senado*, 105 DPR 750, 770 (1977). Ello "no significa poder para actuar en una forma u otra, haciendo abstracción del resto del Derecho." *SLG Zapata-Rivera v. J.F. Montalvo*, supra, citando a *Bco. Popular de P.R. v. Mun. de Aguadilla*, 144 DPR 651, 658 (1997).

## B. Contratación de Servicios Legales

Los contratos son negocios jurídicos bilaterales y, en nuestro ordenamiento, constituyen una de las varias formas en que las personas pueden obligarse entre sí. *Amador Parrilla v. Concilio Iglesia Universal de Jesucristo*, 150 DPR 571, 581 (2001) que cita a *Santiago Nieves v. ACAA*, 119 DPR 711 (1987). Los acuerdos que nacen de los contratos tienen fuerza de ley entre las partes

contratantes y deben cumplirse al tenor de los mismos. Artículo 1044, Código Civil de Puerto Rico, 31 LPRA ant. sec. 2994.[1] Los contratos son obligatorios, cualquiera que sea la forma en que se hayan celebrado, siempre que en ellos concurran las condiciones esenciales para su validez. Artículo 1230, *supra*, 31 LPRA ant. sec. 3451. Por ende, los contratos verbales tienen tanta eficacia como los escritos. *Vila & Hnos., Inc. v. Owens Ill. de P.R.*, 117 DPR 825 (1986). Así pues, el contrato existe desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa o prestar algún servicio. Artículo 1206, *supra*, 31 LPRA ant. sec. 3371. En Puerto Rico, impera el principio de la libertad de contratación, siempre y cuando, los acuerdos no sean contrarios a las leyes, a la moral o al orden público. Artículo 1207, *supra*, 31 LPRA ant. sec. 3372.

Ahora bien, sea verbal o escrito,[2] el tipo de contratación entre un abogado y su cliente es uno de arrendamiento de servicios *sui generis*, pues está supeditado a múltiples consideraciones éticas, inherentes a la profesión legal. *Blanco Matos v. Colón Mulero,* 200 DPR 398, 408-409 (2018), que cita con aprobación a *In re Acevedo Álvarez,* 178 DPR 685, 690 (2010); *In re Delannoy Solé,* 172 DPR 95, 101-102 (2007).

Uno de los aspectos sobre los que directamente recaen las referidas consideraciones éticas son los honorarios de abogado, regulados por el Canon 24 de los de Ética Profesional que, en lo pertinente, establece lo siguiente:

> La fijación de honorarios profesionales debe regirse siempre por el principio de que nuestra profesión es una parte integrante de la administración de la justicia y no un mero negocio con fines de lucro. Al fijar el valor de los honorarios, deben considerarse los siguientes

---

[1] Hacemos referencia al derogado Código Civil de 1930, por sus disposiciones ser aplicables a la fecha de los hechos.

[2] Aun cuando se recomiende que el contrato entre un abogado y su cliente conste por escrito, los acuerdos verbales entre éstos, son válidos. *In re Concepción Peña*, 154 DPR 501, 504-505 (2001). Véase además *Ramírez, Segal & Látimer v. Rojo Rigual,* 123 DPR 161, 172 (1989).

factores: (1) el tiempo y trabajo requeridos, la novedad y dificultad de las cuestiones envueltas y la habilidad que requiere conducir propiamente el caso; (2) si el aceptar la representación del caso en cuestión ha de impedir al abogado que se haga cargo de otros casos que probablemente han de surgir del mismo asunto, y en los cuales existe una razonable expectativa de que de lo contrario sus servicios serán solicitados o que tal representación implique la pérdida de otros asuntos extraños al caso en cuestión o el antagonismo con otros clientes; (3) los honorarios que acostumbradamente se cobran en el distrito judicial por servicios similares; (4) la cuantía envuelta en el litigio y los beneficios que ha de derivar el cliente de los servicios del abogado; (5) la contingencia o certeza de la compensación; y (6) la naturaleza de la gestión profesional, si es puramente casual o para un cliente constante.

Es deseable que se llegue a un acuerdo sobre los honorarios a ser cobrados por el abogado al inicio de la relación profesional y que dicho acuerdo sea reducido a escrito.

El abogado no debe estimar sus consejos y servicios en más ni en menos de lo que realmente valen. Al aceptar la representación profesional de un cliente debe considerar que le debe a éste un máximo de esfuerzo profesional en la medida de su talento y preparación. No debe aceptar retribuciones mínimas con la idea preconcebida de rendir esfuerzos mínimos.

[...]

Un abogado debe exigir el pago de honorarios contingentes sólo en aquellas ocasiones en que dichos honorarios sean beneficiosos para su cliente, o cuando el cliente lo prefiera así después de haber sido debidamente advertido de las consecuencias.

Con el propósito de que los clientes estén protegidos contra cargos injustos, los honorarios contingentes deben ser razonables y estar siempre sujetos a la aprobación del tribunal, en aquellos casos en que la intervención judicial sea requerida por ley o por alguna de las partes en el litigio. [...]

El abogado debe acatar los deseos de un cliente ansioso de transigir su pleito.

[...] 4 LPRA Ap. IX, C. 24.

Por otro lado, el Canon 25 de Ética Profesional, 4 LPRA Ap. IX C. 25, dispone que las controversias de los abogados con sus clientes, con respecto a la compensación por su trabajo, deben evitarse por el abogado en todo lo que sea compatible con el respeto a sí mismo y con el derecho que tenga a recibir una compensación

razonable por los servicios prestados. *In re Meléndez Figueroa*, 166 DPR 199, 208 (2005). Por otro lado, el abogado tiene derecho a recibir una compensación razonable por los servicios que rinde a sus clientes. *Pérez v. Col. Cirujanos Dentistas de PR*, 131 DPR 545, 558 (1992); *Colón v. All Amer. Life & Cas. Co.*, 110 DPR 772, 774 (1981), *Rodríguez v. Ward*, 74 DPR 880 (1953). En específico, en *Nassar Rizek v. Hernández*, 123 DPR 360, 373 (1989), el Tribunal Supremo de Puerto Rico dijo entonces que, "[l]o expuesto tiene como contraparte el derecho del abogado a recibir como profesional una compensación razonable por sus servicios... Como corolario, el abogado está facultado a entablar aquellas reclamaciones judiciales necesarias para el cobro de sus honorarios, aunque cautelarmente, el mismo canon señala que "debe evitarse", a no ser que se presenten únicamente para impedir injusticias, imposiciones o fraude". *Colón v. All Amer. Life & Cas. Co.*, supra, pág. 774; *In re Santos Vías*, 122 DPR 881 (1988).  También, véase, *In re Vélez Lugo*, 180 DPR 987, 996 (2011) que cita a *In re Merced Montañez*, 164 DPR 678, (2005); *Pérez v. Col. Cirujanos Dentistas de PR*, supra.

Si existe un pacto de honorarios entre un abogado y un cliente que cumpla con los rigores éticos, aplica el principio de *pacta sunt servanda*. En el caso que el acuerdo para la prestación de servicios legales sea a base de honorarios contingentes, la Alta Curia ha expresado que "el abogado que acepta ser remunerado a base de honorarios contingentes es compensado si gana el caso, si acontece alguna de las contingencias pactadas y en proporción a la cuantía adjudicada por el tribunal". Esto es, independientemente del tiempo y esfuerzo que haya dedicado, este tipo de acuerdo sujeta el pago de honorarios a la suerte del proceso. *Blanco Matos v. Colón Mulero*, supra, pág. 409, que cita a *Pérez v. Col. Cirujanos Dentistas de PR*, supra.

De otro lado, el Artículo 1473 del derogado Código Civil de Puerto Rico de 1930, aplicable al caso de autos, reconoce el derecho a reclamar el valor razonable de los servicios prestados, incluyendo los legales, a base de un *quantum meruit* ("tanto como se merece"[3]). Reza la disposición civil:

> Pueden arrendarse los servicios de criados y trabajadores sin tiempo fijo o por cierto tiempo. El arrendamiento hecho por toda la vida es nulo. *En cuanto a los servicios profesionales*, se estará, para la remuneración de los mismos, a lo convenido entre las partes; *cuando no hubiere convenio y surgieren diferencias, la parte con derecho a la remuneración podrá reclamar y obtener en juicio de la otra parte, ante cualquier corte de jurisdicción competente, el importe razonable de dichos servicios.* (*Énfasis Nuestro*). 31 LPRA ant. sec. 4111.

El precepto anterior "provee un remedio en restitución basado en elementos de justicia". *Cruz Pérez v. Roldán Rodríguez et al.*, 206 DPR 261, 272 (2021), que cita a *Blanco Matos v. Colón Mulero*, supra, pág. 413. De esta manera, se aspira evitar el empobrecimiento del abogado que presta diligente y éticamente sus servicios legales y el enriquecimiento injusto de quien los recibe. Por lo general, un abogado puede reclamar sus honorarios por los servicios prestados a base de un *quantum meruit* cuando no los haya pactado por contrato. *Id.* Además, se ha resuelto que, de no ser posible la valoración de honorarios por el contrato de contingencia, los tribunales deben estimar la compensación a base del *quantum meruit. Colón v. All Amer. Life & Cas. Co.*, supra, pág. 777.

Recientemente, nuestro Máximo Foro resumió algunas instancias en que los honorarios de abogado podrán ser determinados a base de un *quantum meruit.* Éstas son: (1) que el contrato haya sido invalidado por alguna irregularidad en su ejecución; o (2) el abogado haya sido prematuramente destituido por

---

[3] Véase, *Cruz Pérez v. Roldán Rodríguez*, 206 DPR 261, 271 (2021), que cita a I. Rivera García, *Diccionario de Términos* Jurídicos, 3ra. ed. rev., San Juan, Ed. Lexis 2000, pág. 395).

su cliente; o (3) por instrucciones del cliente, se haya desistido voluntariamente del pleito; o (4) el abogado que "renuncia voluntariamente a la representación legal de su cliente, antes de culminar la gestión profesional para la cual fue contratado y por la cual pretendía cobrar honorarios contingentes, tiene derecho a ser compensado por sus servicios a base de un *quantum meruit* siempre y cuando demuestre que hubo justa causa para la renuncia".[4] En todos estos casos, el abogado reclamante tiene el peso de la prueba. De prevalecer, al determinar la cuantía a pagar, el tribunal debe considerar lo siguiente: "(1) las gestiones profesionales que alegadamente realizó a beneficio de su cliente; (2) las horas o fracción de tiempo que le dedicó a cada una de dichas gestiones y (3) el valor razonable de las horas dedicadas". *Cruz Pérez v. Roldán Rodríguez et al.*, supra, pág. 272, que cita a *Colón v. All Amer. Life & Cas. Co.*, supra.

**III**

En su recurso, la parte apelante le imputa al Tribunal de Primera Instancia incurrir en error al: 1) determinar que la Demandante/Apelada trabajó 250 horas y al conferir una presunción de corrección a la factura de la Apelada, relevándola de su peso de la prueba; 2) al permitir a la Apelada enmendar las alegaciones para traer una nueva teoría ("lodestar") para justificar la factura inflada y 3) en su aplicación de "lodestar" al presente caso. Por estar estrechamente relacionados, discutiremos de manera conjunta, los aludidos señalamientos de error.

En otras palabras, en esencia, nos corresponde determinar si, incidió el foro primario al condenar a la parte apelante a satisfacerle a la parte apelada los honorarios de abogado, por los servicios prestados, según lo dispuesto en la *Sentencia* apelada.

---

[4] *Cruz Pérez v. Roldán Rodríguez et al.*, supra, págs. 272-273 que cita a *Berkan et al. v. Mead Johnson Nutrition*, 204 DPR 183, 216-217 (2020); *Blanco Matos v. Colón Mulero*, supra, pág. 416.

Es preciso destacar que, luego de una minuciosa, sosegada y desapasionada revisión del expediente, así como de la transcripción de la prueba oral que nos fue presentada, no albergamos duda alguna de que las determinaciones de hecho efectuadas por la primera instancia judicial están sostenidas en la prueba desfilada.

Establecido lo anterior, tal cual se desprende del derecho previamente esbozado, nuestro Tribunal Supremo ha establecido unas guías a seguir a la hora de determinar la razonabilidad de los honorarios de abogado en casos, como el que nos ocupa, en que no existe un contrato escrito de servicios profesionales. La Alta Curia ha señalado que, en todos estos casos, el abogado reclamante tiene el peso de la prueba. De prevalecer, al determinar la cuantía a pagar, el tribunal debe considerar lo siguiente: "(1) las gestiones profesionales que alegadamente realizó a beneficio de su cliente; (2) las horas o fracción de tiempo que le dedicó a cada una de dichas gestiones y (3) el valor razonable de las horas dedicadas". *Cruz Pérez v. Roldán Rodríguez et al.*, supra, pág. 272, que cita a *Colón v. All Amer. Life & Cas. Co.*, supra.

En lo pertinente, coincidimos con el foro *a quo* en que la prueba desfilada demostró que la licenciada Hernández prestó servicios a la parte apelante desde el 25 de septiembre de 2018 hasta el 28 de agosto de 2019, más 90 días adicionales, en espera de la entrega de las garantías personales.

El 19 de febrero de 2019, la parte apelada le cursó al licenciado Rosado[5] una factura detallada por la cuantía de $62,656.85 en concepto de honorarios de abogados por los servicios prestados a la parte apelante, por 250.20 horas trabajadas. La factura fue a razón de $250.00 por hora, tarifa autorizada por el Tribunal Federal, foro en el que eminentemente la apelada ejerce su

---

[5] Abogado de la parte apelante y a solicitud de este.

profesión. De acuerdo a la prueba desfilada, el método de facturación utilizado por la parte demandante es el Lodestar (Lodestar Method) que es el que se usa en el Tribunal Federal a la hora de solicitar honorarios.

Según establece nuestro ordenamiento jurídico, *en cuanto a los servicios profesionales*, en las instancias en las que "*no hubiere convenio y surgieren diferencias, la parte con derecho a la remuneración podrá reclamar y obtener en juicio de la otra parte, ante cualquier corte de jurisdicción competente, el importe razonable de dichos servicios*".[6] (*Énfasis nuestro*).

Respecto a los servicios prestados, la prueba estableció que, entre la licenciada Hernández y la doctora Rodríguez hubo más de 140 llamadas telefónicas, ente otras gestiones, que justificaron las 250 horas facturadas.

Puntualizamos que, los servicios prestados por la parte apelada a la parte apelante redundaron en un ahorro de más de $700,000.00 para esta última, sin que tuviera que presentar peticiones de quiebra y sin tener que tributar sobre el balance no pagado.

La parte apelante conservó la Oficina #306 de la Torre HIMA y la propiedad de Maralago ubicada en Palmas del Mar Humacao, se vendió en un *short sale*, y únicamente tuvo que satisfacer $15,000.00. Ello, a pesar de que las sentencias sobre ejecución de hipotecas de ambos inmuebles ascendían a más de $700,000.00. Por la referida oficina, la parte apelante satisfizo la suma de $190,000.00 aproximadamente. En total la parte apelante tuvo que desembolsar $205,000.00 aproximadamente y todas las garantías personales le fueron devueltas.

---

[6] 31 LPRA ant. sec. 4111.

La licenciada Hernández Santiago siempre tuvo la expectativa que la parte apelante le pagaría el dinero adeudado en concepto de honorarios de abogado.

Cabe destacar que, la parte apelante manifestó que estuvo satisfecha con la representación legal de la licenciada Hernández Santiago.

A pesar de que las gestiones profesionales de la parte apelada redundaron en un beneficio económico considerable para la parte apelante, esta le instó una querella ética, la cual fue desestimada por el Alto Foro. No conforme con lo anterior, en una actuación inequívocamente dirigida a evadir su responsabilidad de satisfacer los honorarios de abogado adeudados, instó el recurso que nos ocupa. Recalcamos que, las puertas del Tribunal siempre estarán abiertas para todo litigante que tenga un reclamo genuino y meritorio. Empero, advertimos que, no se pueden utilizar indiscriminadamente los recursos y el tiempo del tribunal como subterfugio para incumplir con las obligaciones contractuales. Máxime, en un caso como este, en el cual quedó demostrado que la parte apelante ha intentado beneficiarse del esfuerzo y la gestión de la parte apelada sin que esta sea remunerada por sus servicios. Esta Curia no puede, de modo alguno, avalar tal proceder.

**IV**

Por los fundamentos que anteceden, se confirma la *Sentencia* apelada.

Notifíquese.

Lo acordó y manda el Tribunal, y certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones